STATE OF CONNECTICUT *v.* MICHAEL ROSS
(SC 17422)
(SC 17423)

Sullivan, C. J., and Norcott, Vertefeuille, Zarella, Lavery, Dranginis and Flynn, Js.

Argued May 5—officially released May 9, 2005*

*Michael P. Shea*, with whom were *Thomas J. Groark, Jr.*, and *James Mahanna*, for the plaintiff in error-appellant (special counsel).

*Harry Weller*, supervisory assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, *Susan C. Marks*, supervisory assistant state's

---

* May 9, 2005, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

attorney, *Marjorie Allen Dauster*, senior assistant state's attorney, *Robert J. Scheinblum*, assistant state's attorney, and *Jessica Probolus*, special deputy assistant state's attorney, for the defendant in error-appellee (state).

*Opinion*

SULLIVAN, C. J. This appeal[1] is brought by Thomas J. Groark, Jr., in his capacity as special counsel appointed by the trial court to investigate, prepare and present legal arguments that the defendant, Michael Ross, is incompetent to waive further postconviction challenges to his sentences of death. After a hearing, the trial court found that the defendant was competent and his waiver was knowing, intelligent and voluntary. Special counsel challenges that finding on appeal. We affirm the judgment of the trial court.

The record reveals the following procedural history. More than twenty years ago, the defendant "was charged in three cases with eight counts of capital felony in violation of General Statutes § 53a-54b. The trial court dismissed two counts for lack of territorial jurisdiction and, after a jury trial, the defendant was convicted of four counts of capital felony in violation of

---

[1] Because special counsel was uncertain whether his status as appointed special counsel would allow him to bring this appeal, he filed a writ of error raising identical issues at the same time that he filed this appeal. See General Statutes § 52-263 (party aggrieved by decision of Superior Court may appeal); see also *State* v. *Salmon*, 250 Conn. 147, 167, 735 A.2d 333 (1999) (nonparty has no right to appeal pursuant to § 52-263). As is more fully discussed later in this opinion, we conclude that, under the unique circumstances of this case, special counsel has standing to appeal. Accordingly, we dismiss the writ of error as moot.

In addition to the writ of error and appeal, special counsel filed a motion to be appointed special counsel for the purpose of prosecuting the appeal. We conclude that the motion is moot because the trial court's appointment of Thomas J. Groark, Jr., as special counsel continued through to this appeal. Cf. *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 459, 610 A.2d 598 (1992) (trial and ensuing appeal are not separate and distinct proceeding but part of continuum of process of adjudication).

§ 53a-54b (5) and two counts of capital felony in violation of § 53a-54b (6).[2] *State* v. *Ross*, 230 Conn. 183, 188, 194–95, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) . . . . After a separate penalty phase hearing pursuant to General Statutes (Rev. to 1987) § 53a-46a, he was sentenced to death. The defendant appealed from the judgments to this court. We affirmed the defendant's convictions, but determined that certain evidentiary rulings by the trial court in the penalty phase had impaired the defendant's ability to establish a mitigating factor and, accordingly, we reversed the judgments imposing the death penalty. [Id.], 286. On remand, a second penalty phase hearing was held before a jury, which found an aggravating factor for each capital felony conviction and no mitigating factor. In accordance with the jury's findings, the court, *Miano, J.*, imposed a death sentence on each count. *State* v. *Ross*, 269 Conn. 213, 223–24, 849 A.2d 648 (2004). The defendant again appealed from the judgments to this court, and we affirmed the sentences of death. Id., 392." (Internal quotation marks omitted.) *State* v. *Ross*, 272 Conn. 577, 579–80, 863 A.2d 654 (2005).

"Thereafter, on September 21, 2004, T. R. Paulding, Jr., an attorney, entered appearances in the three criminal cases against the defendant. His appearances were in lieu of the appearances by attorneys employed by

---

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) murder committed in the course of the commission of sexual assault in the first degree . . . ."

The criminal conduct in this case occurred in 1983 and 1984. Section 53a-54b has been amended several times since 1984 for purposes not relevant here. For convenience, we cite the current version of the statute although we take note of the fact that prior to the enactment of No. 01-151, § 3, of the 2001 Public Acts, the provision of the statute concerning murder committed in the course of the commission of sexual assault in the first degree had been designated subdivision (7) rather than subdivision (6).

the public defender's office. At the same time, Paulding sent a letter to the trial court, *Clifford, J.*, indicating that the defendant intended to waive any further appeals or collateral attacks on his death sentences and that he wanted the court to set an execution date." Id., 580.

The trial court held a hearing at which it canvassed the defendant about his decision to waive further challenges to the death sentences. The court indicated that it saw no evidence that the defendant was not competent and set January 26, 2005, as the execution date. Id., 581.

Despite the fact that Paulding had appeared for the defendant in lieu of the public defenders, "[o]n December 1, 2004, the [public defender's office] filed a motion to proceed in forma pauperis and a petition for writ of certiorari in the United States Supreme Court. The [public defender's office] represented in the filings that the defendant had refused to sign an affidavit of indigence in support of the motion because he was incompetent. The United States Supreme Court denied the motion on January 10, 2005. [See *Ross* v. *Connecticut*, 543 U.S. 1046, 125 S. Ct. 943, 160 L. Ed. 2d 766 (2005).]

"Also on December 1, 2004, the [public defender's office] filed in the Superior Court a motion for permission to appear as (1) next friend of [the defendant]; and (2) as a party in interest or as an intervener or as amicus curiae. The [public defender's office] alleged in its motion that it had standing to appear as the defendant's next friend because the defendant was incompetent when he terminated the [public defenders'] representation of him; because [the defendant] is presently incompetent; and because the [public defender's office] has had a significant relationship with [the defendant] for some seventeen years . . . . In addition to the motion for permission to appear, the [public defender's office] lodged with the court clerk a motion for

stay of the defendant's execution pending a judicial determination as to whether the defendant is competent and a motion for stay of execution pending resolution of the pending consolidated litigation ordered by this court to determine whether Connecticut's death penalty system is racially discriminatory and therefore violates the state constitution and statutory law (consolidated litigation).

"Thereafter, the state filed a motion seeking a determination as to whether the defendant was competent to waive his rights to seek postconviction relief and whether his waiver was knowingly and voluntarily made. The court held a competency hearing on December 9, 2004. Because the trial court had not yet ruled on the [public defenders'] motion to appear, the [public defender's office] attended the hearing only as an observer." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 272 Conn. 581–83.

At the December 9, 2004 hearing, the court heard testimony from Paulding and the defendant. At the conclusion of the hearing, the court stated that, "although it would appear to a layperson that the defendant was competent under any standard that would apply, the court required additional information as to whether the defendant had any mental disorder, disease or defect that might affect his decision. Accordingly, the court ordered that the defendant undergo a competency examination by Michael Norko, a psychiatrist, and scheduled a competency hearing for December 28, 2004. The court also scheduled a hearing on the [public defenders'] motion to appear on behalf of the defendant for December 15, 2004." (Internal quotation marks omitted.) Id., 587. After hearing arguments by the parties and the public defender's office at the December 15, 2004 hearing, the court denied the motion to appear. Id., 588.

"Thereafter, on December 23, 2004, the [public defender's office] filed one motion in this court for review of the trial court's denial of its motion for a stay of the competency hearing and for stay of execution, and a second motion for emergency stay of the competency hearing and of execution. The [public defender's office] indicated in the motions that it intended to file a writ of error challenging the trial court's rulings on [its] standing on December 27, 2004. This court dismissed both motions. On December 28, 2004, the [public defender's office] brought [a] writ of error claiming that the trial court improperly had (1) refused to allow the [public defender's office] to present evidence and to cross-examine witnesses at the December 28, 2004 hearing and (2) denied the [public defender's office's] request to appear as an amicus curiae." Id.

At the December 28, 2004 competency hearing, the trial court heard testimony from Norko and the defendant and found that the defendant was competent under the standard set forth in *Rees* v. *Peyton*, 384 U.S. 312, 314, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966) (defendant is competent to waive further challenges to death sentence when "he has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation"). See *State* v. *Ross*, supra, 272 Conn. 591.

"Thereafter, at oral argument before this court on [its] writ of error, the [public defender's office] represented that it had evidence of the defendant's incompetence that had never been presented to any court. In light of this representation, and despite the . . . failure [of the public defender's office] to make an offer of proof to the trial court, this court issued an order authorizing the [public defender's office] to file with this court a written offer of proof detailing the evidence that it would present at a competency hearing. The [public defender's office] filed an offer of proof,

attaching summaries of the proposed testimony of Stuart Grassian, a psychiatrist; Eric Goldsmith, a psychiatrist; five attorneys with the public defender's office, namely, Barry Butler, [Karen] Goodrow, Paula Montonye, Lauren Weisfeld and John Holdridge; Robert Nave, the state death penalty abolition coordinator for the Connecticut branch of Amnesty International and executive director of the Connecticut Network to Abolish the Death Penalty; and Dan Ross, the defendant's father. The offer of proof also attached several documents that the [public defender's office] proposed to introduce as exhibits."[3] Id., 592.

Upon review of the evidence presented at the December 28, 2004 hearing and the offer of proof filed by the public defender's office, this court concluded that the public defender's office had failed to present "meaningful evidence" that the defendant was incompetent and, therefore, under the rule set forth in *Demosthenes* v. *Baal*, 495 U.S. 731, 736, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990), the public defender's office was not entitled to participate in an evidentiary hearing at which it could attempt to establish the defendant's incompetence and its standing to appear as the defendant's next friend.[4]

---

[3] The record in the present appeal reveals that the public defender's office had information pertaining to the effect of the defendant's mental disorders and the conditions of confinement on death row on his ability to make decisions about legal proceedings at least as early as 2000. The public defender's office did not make any claim that the defendant was incompetent to waive further legal proceedings, however, until it filed the petition for certiorari in the United States Supreme Court in December, 2004, and, despite the trial court's instructions that it should provide any evidence of the defendant's incompetence to counsel for the defendant; see *State* v. *Ross*, supra, 272 Conn. 588; did not produce any such evidence in any forum (with the minor exception of certain personal observations by various public defenders) until ordered by this court to do so.

[4] We note that at the same time that the public defender's office was seeking to be appointed as the defendant's next friend in this court, Dan Ross was seeking to be appointed as his next friend in the United States District Court for the District of Connecticut. See *Ross* v. *Rell*, United States District Court, Docket No. 3:04CV2186 (D. Conn. January 10, 2005). The District Court, Droney, J., concluded that the defendant had "amply demon-

*State* v. *Ross,* supra, 272 Conn. 611. Accordingly, we affirmed the judgment of the trial court denying the motion of the public defender's office to appear as the defendant's next friend. Id., 613.

After our ruling, the public defender's office filed a petition for a writ of habeas corpus on behalf of the defendant in the United States District Court for the District of Connecticut, again arguing that the defendant was incompetent and that it should therefore be allowed to appear as his next friend. See *Ross* v. *Lantz,* United States District Court, Docket No. 3:05CV00116 (D. Conn. January 24, 2005). The District Court, Chatigny, J., held a hearing on the petition and concluded that the public defender's office had satisfied the requirements for next friend standing. Id. Accordingly, the court ordered that an evidentiary competency hearing be held and stayed the execution of the death sentences pending resolution of the matter. The commissioner of correction appealed from the decision to the United States Court of Appeals for the Second Circuit and filed a motion to vacate the stay in that court. See *Ross* v. *Lantz,* United States Court of Appeals, Docket No. 05-8900 (2d Cir. January 25, 2005). The Court of Appeals concluded that the District Court should not have granted next friend status to the public defender's office without first holding a competency hearing. Id. Accordingly, the Court of Appeals ordered the District Court to conduct the hearing "as expeditiously as is reasonably practicable," dismissed the appeal, and denied the motion to vacate the stay. Id.

The commissioner of correction then filed an application to vacate the stay of execution with the United

strated" his competence to waive further legal proceedings and that there was "no basis for ordering a full evidentiary hearing on the issue of his competency. Nor, given [the defendant's] reasoned and rational decision not to pursue [further proceedings, was] there any basis for allowing a 'next friend' to pursue it on his behalf." Id.

States Supreme Court. On January, 27, 2005, the court granted the application. See *Lantz* v. *Ross*, 543 U.S. 1134, 125 S. Ct. 1117, 160 L. Ed. 2d 1091 (2005). Meanwhile, the commissioner of correction had rescheduled the execution to January 29, 2005, at 1 a.m.

On January 28, 2005, at 3 p.m., the District Court, Chatigny, J., convened a telephone conference call among Paulding; counsel for Dan Ross,[5] Antonio Ponvert III and James Nugent; three attorneys for the public defender's office, Hubert J. Santos, Hope C. Seely and Patrick J. Culligan; and three attorneys for the state, Terrence M. O'Neill, Michael E. O'Hare and Susan Quinn Cobb. During the telephone conference, Judge Chatigny indicated that he had received a letter from a prisoner who claimed to have been incarcerated with the defendant that raised new questions about the effect of the defendant's conditions of confinement on his competence. The court also indicated that the fact that Norko was "admittedly ignorant" of "death row syndrome"[6]

---

[5] Dan Ross had filed a petition for a writ of habeas corpus in the United States District Court for the District of Connecticut in which he claimed that he had independent standing as the defendant's father to seek relief in the courts under 42 U.S.C. § 1983. Dan Ross requested that the court enter a temporary restraining order prohibiting the defendant's execution until his competency and the constitutionality of this state's death penalty scheme were determined. On January 26, 2005, the District Court, Chatigny, J., held a hearing on the petition by telephone and granted the request for a temporary restraining order. See *Ross* v. *Rell*, United States District Court, Docket No. 03:05CV00130 (D. Conn. January 26, 2003). The commissioner of correction filed an application to vacate the temporary restraining order with the United States Court of Appeals for the Second Circuit. The Court of Appeals granted the application, but stayed its order until January 30, 2005, at 12:01 a.m. See *Ross* v. *Lantz*, United States Court of Appeals, Docket No. 05-8901 (2d Cir. January 28, 2005). Dan Ross then filed an application to stay the execution and for a temporary restraining order in the United States Supreme Court. On January 28, 2005, the Supreme Court denied the application and vacated the temporary stay entered by the Court of Appeals. See *Ross* v. *Rell*, 543 U.S. 1134, 125 S. Ct. 1117, 160 L. Ed. 2d 1092 (2005).

[6] The offer of proof submitted by the public defender's office to the District Court contained a summary of proposed testimony by Grassian that prisoners confined to death row often develop severe mental disturbances that can affect their ability to make voluntary decisions. Norko testified at the

should cause Paulding "tremendous unease . . . ." The court stated that if an investigation after the defendant's death revealed that the defendant was incompetent, the court would "have [Paulding's] law license."

After the telephone conference ended, Paulding requested that the execution be stayed temporarily so that he could investigate whether, in light of the District Court's action, he had a conflict of interest that would impinge on his ability to represent the defendant. The state, which had indicated repeatedly throughout the proceedings that any request for a stay made by the defendant would be honored, agreed, and the commissioner of correction stayed the execution until January 31, 2005, at 9 p.m. On January 31, 2005, as the death warrant issued by the trial court was about to expire,[7] the defendant filed a motion to intervene and for stay of execution in the District Court.[8] The defendant also

competency hearing at issue in the present case that the term "death row syndrome" is a term used in legal literature, not in medical literature. He further testified that he had been aware throughout the course of his evaluation of the defendant that "confinement is stressful and that confinement on death row is particularly stressful . . . ." He further testified that he was aware that the stress of confinement may lead to psychological or psychiatric disorders and that he looked for such disorders when evaluating the defendant. He found that the defendant suffered from the specific disorders to which he testified in the previous competency hearing. Special counsel has conceded that testimony at the competency hearing at issue in the present appeal did not establish that the defendant suffered from death row syndrome and the condition is not at issue in this appeal.

[7] General Statutes § 54-99 provides in relevant part: "All executions of the death penalty shall take place according to the provisions of this section and section 54-100 on the day, or within five days after the day, designated by the judge passing sentence." As we have indicated, the trial court had designated January 26, 2005, as the date of execution.

[8] Attached to the motion was an affidavit by Norko dated January 30, 2005, in which he stated that "[i]n the last two days, I have reviewed documentation that was not provided to me prior to rendering [his opinion at the December 28, 2004 competency hearing]. In particular, I have reviewed a letter, dated June, 2003 and authored by [the defendant], as well as a letter from [the defendant], dated [May 24, 1998]. These documents were submitted to the Connecticut Supreme Court, pursuant to its request, as part of a larger [o]ffer of [p]roof from the Chief Public Defender's office. . . . Had

filed a motion for stay of execution in the Superior Court in which he requested that the competency hearing be reopened.[9] Thereafter, this court entered a stay of execution until the expiration of the death warrant at midnight on January 31, 2005.

The state then filed a motion in the trial court seeking a determination as to whether the District Court's action had created a conflict of interest for Paulding. The court held a hearing on the motion on February 3 and February 10, 2005. The state stated at the hearing that the conflict that required resolution was between Paulding's obligation to advocate vigorously for the defendant's claim that he was competent to waive further

---

I been provided with these documents prior to conducting my most recent interview and evaluation of [the defendant], it is possible that my eventual conclusions and opinion would have been different." (Internal quotation marks omitted.) The state's attorney represented to the trial court at a hearing on February 10, 2005, that the offer of proof had been provided to Norko by Goodrow on January 29, 2005.

Also attached to the motion were an affidavit by Martha Elliot, a journalist and a friend of the defendant's, indicating that the defendant had told her that he believed that he suffered from " '[d]eath [r]ow [s]yndrome' "; a letter from the defendant to Elliot dated May 24, 1998, in which he indicated that, in waiving further legal proceedings, he "was driven more by a desire to end [his] own pain than out of any noble cause"; and an affidavit by John F. Tokarz, a former employee with the department of correction, indicating that he was familiar with death row and the defendant, that the conditions on death row were harsh and that, in his opinion, the harsh conditions "played a substantial role in [the defendant's] decision to waive his legal remedies . . . ."

[9] Paulding has represented on several occasions that he filed the motion to stay the execution and to reopen the competency hearing because he had assured the trial court repeatedly, with the defendant's knowledge and consent, that if evidence of the defendant's incompetence came to his attention, he would provide it to the trial court. He believed that Norko's statement that it was "possible" that his opinion that the defendant was competent might have been different if he had had the opportunity to question the defendant about certain materials in the offer of proof submitted by the public defender's office came within that promise to the trial court. See footnote 8 of this opinion. It is clear, however, that Paulding never wavered in his professional opinion that the defendant was competent, even after learning of Norko's statement.

legal proceedings, and Paulding's fear of losing his law license if he did so. The defendant stated that both he and Paulding continued to believe that he was competent but that Paulding did not feel that he was in the "frame of mind" to advise the defendant and go forward with the execution under the circumstances. The defendant further stated that the only reason that he would agree to another competency hearing was to protect Paulding's license. The court concluded that, in order to address Paulding's potential conflict of interest, it would appoint Groark as special counsel to investigate and present evidence that the defendant was incompetent. The state indicated that it did not believe that there was any "new and meaningful information" to justify another competency hearing, but agreed that the appointment of special counsel was "the best way to resolve [Paulding's] dilemma . . . ." At the conclusion of the February 10, 2005 hearing, the court set a new execution date of May 11, 2005.

The trial court held a competency hearing on April 7, 8, 11, 12, 13 and 14, 2005. Dan Ross, the defendant, Norko, Grassian, Goldsmith, Suzanne Gentile, who is a psychiatrist retained by Paulding on behalf of the defendant, Holdridge and John F. Tokarz, a former employee of the department of correction, testified at the hearing. The depositions of Martha Elliot, a journalist and friend, and Susan P., the defendant's girlfriend, were read into the record. In its memorandum of decision, the trial court noted that Dan Ross, Elliot and Susan P. all claimed that the defendant's stated motivations for waiving further legal proceedings were false. The court also noted that these witnesses were "opposed to the death penalty in general, are close friends or family of [the defendant], and do not personally support his decision to die" and, therefore, were not "unbiased witnesses . . . ." With respect to the psychiatric testimony, the court concluded that all four

psychiatrists agreed that the defendant suffered from sexual sadism, anxiety disorder and depression or mood disorder, all of which had been successfully controlled with medication, and personality disorder with narcissistic, borderline and antisocial traits. The court also noted that the psychiatrists had drawn conflicting conclusions about the effect of the defendant's personality disorder on his ability to make decisions. Norko and Gentile testified that his narcissism had no substantial effect on his ability to make rational choices. Grassian and Goldsmith testified that the defendant's narcissistic traits, including his grandiosity, inability to empathize, self-centeredness and arrogance, compelled him to posture as a good and noble person by claiming that his decision to waive further legal proceedings was driven by a desire to spare further pain to the families of his victims, despite his complete lack of empathy for the families. They further testified that the defendant's narcissism made it impossible for him to bear the perceived humiliation of backing down from the decision. Accordingly, they testified that the defendant was not competent and his decision was not voluntary. The court found that the testimony of Norko and Gentile was more credible than the testimony of Grassian and Goldsmith and found by a preponderance of the evidence that, although the defendant suffered from a variety of mental disorders, "those disorders taken individually or together do not substantially affect his understanding of his legal position and the options available to him . . . [or] his ability to make a rational choice among his options." This appeal followed.

Special counsel claims on appeal that the trial court improperly determined that the state had satisfied its burden of proving that the defendant's waiver of his right to seek postconviction relief was voluntary. The state counters that: (1) this court lacks subject matter jurisdiction over the appeal because special counsel is

a nonparty and is not aggrieved by the trial court's finding that the defendant is competent; and (2) if this court determines that it has jurisdiction over the appeal, the trial court's finding that the defendant was competent is not clearly erroneous.[10] We conclude that we have jurisdiction to hear special counsel's appeal. We further conclude that special counsel's claim that the defendant's waiver of further challenges to his death sentences was "involuntary," dependent as it is on challenging facts found by the trial court, must be construed as a claim that the defendant was not competent because his volitional capacity was impaired. Finally, we conclude that the trial court's finding that the defendant was competent was not clearly erroneous.

## I

Before addressing the merits of special counsel's claims on appeal, we must address the state's claim that this court lacked subject matter jurisdiction to hear the appeal. See *Esposito* v. *Specyalski*, 268 Conn. 336, 348, 844 A.2d 211 (2004). "A determination regarding . . . subject matter jurisdiction is a question of law . . . ." (Internal quotation marks omitted.) *Sweeney* v. *Sweeney*, 271 Conn. 193, 207, 856 A.2d 997 (2004).

"[T]he right of appeal is purely statutory. It is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met." (Internal quotation marks omitted.) *Hartford*

---

[10] The state also claims that the trial court was bound by our determination in *State* v. *Ross*, supra, 272 Conn. 611, that there was no meaningful evidence that the defendant was incompetent to justify a full evidentiary hearing. As we have indicated, however, the state agreed that, under the unique circumstances of this case, the trial court should hold such a hearing. Accordingly, we conclude that it waived any objection to the hearing. To the extent that the state claims that our decision in *State* v. *Ross*, supra, 611, required the trial court to hold special counsel to a heightened standard, we conclude for reasons set forth later in this opinion that we need not decide whether the trial court applied the proper standard of review.

*Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 271 Conn. 474, 495, 857 A.2d 893 (2004), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005). In *State* v. *Salmon*, 250 Conn. 147, 162–63, 735 A.2d 333 (1999), we held that, in order to establish a right of appellate review pursuant to General Statutes § 52-263,[11] the appellant must establish that: "(1) it was a party to the underlying action; (2) it was aggrieved by the trial court decision; and (3) the appeal is from a final judgment." We held in *Salmon* that the word "party" as used in § 52-263 meant "those by or against whom a legal suit is brought . . . the party plaintiff or defendant, whether composed of one or more individuals and whether natural or legal persons." (Internal quotation marks omitted.) Id., 154. We further noted that "[t]he test for determining aggrievement encompasses a . . . twofold determination: first, the party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community as a whole; second, the party claiming aggrievement must establish that this specific personal and legal interest has been specifically and injuriously affected by the decision." (Internal quotation marks omitted.) Id., 163 n.15.

The state claims that special counsel does not meet either the test for establishing that he is a party or the test for establishing that he is aggrieved. In support

---

[11] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

of this claim, the state essentially argues that special counsel was appointed as an amicus curiae and, as such, had no "specific personal and legal interest [that] has been specifically and injuriously affected by the decision" that would confer standing to appeal.[12] Special counsel was appointed to advocate the position that the defendant is incompetent, however, because both the state and the defendant agreed that, under the unique circumstances of this case, Paulding was no longer capable of representing the defendant in a completely disinterested manner. They further agreed that the fairest way to resolve Paulding's "dilemma" was to assume that a sufficient showing of incompetence had been made to require a full-blown, adversarial competency hearing.[13] Special counsel's role at the hearing was not to assist the trial court in an impartial manner; it was to *advocate* the position that the defendant was incompetent and, therefore, to allow him to waive further legal proceedings would violate his due process rights. Cf. *State* v. *Ross*, supra, 269 Conn. 270 (conviction of defendant who is not competent to stand trial violates due process). Thus, the trial court effectively

---

[12] "Historically, amicus curiae was defined as one who interposes in a judicial proceeding to assist the court by giving information, or otherwise, or who conduct[s] an investigation or other proceeding on request or appointment therefor by the court. . . . Its purpose was to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest. . . . The orthodox view of amicus curiae was, and is, that of an *impartial* friend of the court—*not an adversary party in interest in the litigation.* . . . The position of classical amicus in litigation was not to provide a highly partisan account of the facts, but rather to aid the court in resolving doubtful issues of law. . . . Amicus . . . has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest . . . and amicus has been consistently precluded from initiating legal proceedings, filing pleadings, or otherwise participating and assuming control of the controversy in a totally adversarial fashion. . . . Historically, an amicus could not join issues not joined by the parties in interest . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ross*, supra, 272 Conn. 612.

[13] See footnote 10 of this opinion.

severed the defendant's autonomy interest in waiving further legal proceedings, which Paulding has continuously represented to the courts, from his interest in ensuring that his due process rights were protected, and appointed special counsel for the limited purpose of representing the latter interest.[14] Accordingly, we conclude that, under the unique circumstances of this case, special counsel was acting as counsel for the defendant's interest for that limited purpose and that he was required to do so as a result of the District Court's action. We conclude, therefore, that he was an aggrieved party under § 52-263 and has standing to appeal from the trial court's determination that the defendant was competent.

We emphasize that our conclusion that special counsel had standing to advocate the position that the defendant was incompetent to the trial court and to bring this appeal is limited to the specific circumstances of this case. This case is sui generis and was precipitated by Judge Chatigny's action. We do not intend to suggest that counsel representing a defendant who desires to waive further proceedings in a capital case has an inherent conflict of interest requiring the appointment of separate counsel to advocate for incompetence. As long as counsel is qualified and competent and, in the exercise of his or her independent professional judgment, believes that his or her client meets the legal standard for competence, no conflict arises.

## II

We next address the substance of special counsel's claims on appeal. At the outset, we set forth the appropriate standard of review. Special counsel argues that a determination as to the voluntariness of a waiver of constitutional rights is subject to de novo review. See

---

[14] We emphasize that special counsel has conceded that he has no special relationship with the defendant and is not acting as his next friend.

*State* v. *Cobb*, 251 Conn. 285, 358–59, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). The state counters that, because the trial court's competency determination was a finding of fact, it is subject to a clearly erroneous standard of review. See *Demosthenes* v. *Baal*, 495 U.S. 731, 735, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990) (state court's conclusion regarding defendant's competency to waive further challenges to death sentence is finding of fact entitled to presumption of correctness); *Rumbaugh* v. *Procunier*, 753 F.2d 395, 399 (5th Cir.) (determination as to whether defendant suffers from mental disease that impairs ability to make rational decision to waive further challenges to death sentence must be accepted unless clearly erroneous), cert. denied sub nom. *Rumbaugh* v. *McCotter*, 473 U.S. 919, 105 S. Ct. 3544, 87 L. Ed. 2d 668 (1985). The state further contends that because the defendant was not subject to any external coercion in reaching his decision to waive further appeals, the voluntariness of his waiver, as that concept is typically understood in connection with claims that a waiver of a constitutional right was not voluntary, is not in issue. We agree with the state.

It is well established that a waiver of constitutional rights must be voluntary. See *State* v. *Whitaker*, 215 Conn. 739, 753, 578 A.2d 1031 (1990). In making that determination, courts look to the totality of circumstances. Id., 753–54. "Those potential circumstances include . . . the *crucial element* of police coercion . . . the defendant's maturity . . . education . . . physical condition . . . and mental health . . . ."[15]

---

[15] See also *Stano* v. *Dugger*, 921 F.2d 1125, 1144–45 (11th Cir. 1991) (en banc) (in determining whether waiver of counsel is knowing, intelligent and voluntary, court considers: "[1] the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; [2] the extent to which the defendant had contact with lawyers prior to the trial; [3] the defendant's knowledge of the nature of the charges, the possible defenses, and the possible penalty; [4] the defendant's understanding of the rules of procedure, evidence and courtroom decorum;

(Citations omitted; emphasis added.) *Withrow* v. *Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993); see also *Colorado* v. *Connelly*, 479 U.S. 157, 165, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (claim that confession was involuntary requires showing of state action); *Colorado* v. *Connelly*, supra, 165–66 (rejecting claim that determining voluntariness of confession requires court to "divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision"). These cases establish that, although a defendant's mental condition is to be considered in determining whether he has voluntarily waived a constitutional right, a showing of governmental coercion is an essential factual predicate to a finding that the waiver was involuntary.[16] They further establish that, although a defendant's mental condition must be considered in this context *to determine the extent to which it rendered him susceptible to governmental coercion,* the broader issue of competence is not relevant to whether

[5] the defendant's experience in criminal trials; [6] whether standby counsel was appointed, and the extent to which he aided the defendant; [7] whether the waiver of counsel was the result of mistreatment or coercion; or [8] whether the defendant was trying to manipulate the events of the trial" [internal quotation marks omitted]).

[16] But see *Wilkins* v. *Bowersox,* 145 F.3d 1006 (8th Cir. 1998), cert. denied, 525 U.S. 1094, 119 S. Ct. 852, 142 L. Ed. 2d 705 (1999). In *Wilkins,* the court concluded that the court's decision in *Colorado* v. *Connelly,* supra, 479 U.S. 164, that a defendant's mental condition is not relevant to a determination of voluntariness unless there is proof that the defendant was subjected to coercive pressures by the state, was limited to claims involving allegedly involuntary confessions. *Wilkins* v. *Bowersox,* supra, 1012. The court relied on expert testimony that the defendant was driven by an internal coercion in support of its conclusion that the District Court properly had found that the defendant's waiver of counsel was not voluntary or intelligent. Id., 1014. For the reasons set forth more fully in the body of this opinion, we conclude that the court in *Wilkins* improperly conflated the issue of voluntariness, as that concept typically is understood in the context of waiver of constitutional rights, with the issue of whether the defendant was capable not only of reaching a rational decision, but also of exercising his volition in accordance with his decision, which is a question of competence.

the waiver was voluntary. For example, a defendant with substantial mental disabilities voluntarily can waive the right to keep silent and such a waiver is valid regardless of whether the defendant was competent. See *Colorado* v. *Connelly*, supra, 161, 166 (confession of schizophrenic defendant who was following "voice of God" was voluntary).

Some waivers require a determination that the defendant was competent, however, *in addition* to a determination that the waiver was voluntary. It is undisputed in the present case, for example, that a defendant who is shown to be incompetent cannot validly waive post-conviction challenges to a death sentence. In *Rees* v. *Peyton*, 384 U.S. 312, 314, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966), the United States Supreme Court held that the standard for competency in this context is whether the defendant "has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." At least one court has suggested that the *Rees* competency standard may have a volitional component as well as cognitive component so that a defendant who is capable of rationally understanding and evaluating his options may, nevertheless, be incompetent if he has a mental condition that substantially affects his ability to make or follow through on a rational decision. See *Rumbaugh* v. *Procunier*, supra, 753 F.2d 399.[17] In *Rumbaugh*, the defendant sought to

---

[17] In *Rumbaugh*, the court stated that the *Rees* test "requires the answer to three questions:

"(1) Is the person suffering from a mental disease or defect?

"(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

"(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from

end postconviction proceedings challenging his death sentence and his parents sought standing as next friends to continue the proceedings. Id., 396. Upon finding that the defendant was competent, the District Court dismissed the next friend petition and the parents appealed. Id. On appeal, the Court of Appeals reviewed psychiatric testimony that the defendant was able to appreciate his position and that his choice to decline further challenges to his death sentence was rational; id., 399; but that he had a mental disorder, depression, that acted as a "coercive force that influence[d] him not to want to . . . exhaust his further appeals . . . ." Id., 400. The court noted that the parents' claim required it to consider for the first time "how a court should treat a mental disease which does not impair the cognitive function but impacts only on the volitional, the person's ability to make a rational choice among available options." Id., 399. The court ultimately rejected the claim that the defendant was incompetent.

Thus, although a voluntariness determination has a mental state component involving the defendant's susceptibility to government coercion, and although some courts have suggested that a competence determination has a volitional component, it is clear that voluntariness and volitional capacity are entirely separate legal concepts and are subject to entirely different inquiries. Whether a waiver was voluntary is determined on the

---

making a rational choice among his options?" *Rumbaugh* v. *Procunier*, supra, 753 F.2d 398. The court in *Rumbaugh* concluded that the third prong of this inquiry contained a volitional component. See id., 399.

As the state points out, the court in *Rumbaugh* modified the *Rees* standard by stating that a defendant is not incompetent unless his mental disorder *prevents* him from understanding his legal options and making a rational choice. Cf. *Rees* v. *Peyton*, supra, 384 U.S. 314 (defendant is incompetent if mental disorder *substantially affects* ability to understand options and make decision). As the state also points out, the trial court in the present case applied the three prong *Rumbaugh* standard, but modified it to conform to *Rees*.

totality of the circumstances, and a showing of governmental coercion is a necessary factual predicate for a finding of involuntariness.[18] Whether the defendant's volitional capacity was impaired is a component of a competency determination and requires the court to determine whether the defendant had a mental disease or defect that substantially affected his ability to make a rational choice among his options. See footnote 17 of this opinion.

There is no claim of governmental coercion in this case.[19] Accordingly, special counsel's claim that the defendant's conduct was involuntary must be construed as a claim that the defendant was incompetent because his volitional capacity was impaired. Because the ques-

[18] In her concurring opinion, Judge Dranginis argues that we need not decide this question in the present case. She would conclude, however, that a defendant's volitional capacity can be a dispositive factor in determining whether a waiver of constitutional rights was voluntary. Thus, she would conclude that state coercion is *not* an essential factual predicate to a finding of involuntariness. In other words, she decides the question.

Judge Dranginis also argues that our decision is flawed because there is no volitional component to the competency requirement for waiving certain rights. She suggests, for example, that, under our decision, "[u]nless the state has taken affirmative action to force the defendant's hand in waiving his right to counsel, it is of no significance that the defendant is incapable of exercising free will." We agree that the defendant's volitional incapacity would have no effect on a finding of *voluntariness* under that scenario. In our view, however, our decision leaves open the question of whether in another case a defendant would be able to "assist in his own defense"; see General Statutes § 54-56d (a); see also *State* v. *Ross*, supra, 269 Conn. 271 (§ 54-56d [a] mirrors competency standard set forth in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 [1960] [per curiam]); and, therefore, leaves open the question of whether his waiver of right to counsel would be valid.

Finally, Judge Dranginis states that we have concluded that the defendant's waiver was voluntary. We have not concluded that the waiver was voluntary, however, that involuntariness is not an issue in this case.

[19] The only colorable claim of governmental coercion was the suggestion in earlier proceedings that the defendant might suffer from "death row syndrome." As we have indicated, special counsel concedes that the defendant does not suffer from death row syndrome, if such a syndrome exists, and the special counsel's psychiatric experts made no such claim.

tion of whether the defendant's mental illness impaired his volitional capacity, i.e., whether it substantially affected his ability to make a free choice among his options, is a question of competency, it is a question of fact, not of law. See *Demosthenes* v. *Baal*, supra, 495 U.S. 735; *Rumbaugh* v. *Procunier*, supra, 753 F.2d 399. Accordingly, we must determine whether the trial court's finding that the defendant was competent to waive further challenges to his death sentences was clearly erroneous. See *Sargent* v. *Smith*, 272 Conn. 722, 728, 865 A.2d 1129 (2005) (trial court's factual finding is reversible only if clearly erroneous).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 728–29. The general rule is that a finder of fact "is free either to accept or reject, in whole or in part, the evidence presented by the . . . . witnesses . . . . [T]he credibility of the . . . expert and lay witnesses, and the weight to be given to their testimony . . . is a matter committed to the sound judgment and common sense of the trier of fact." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 269 Conn. 319.

With respect to the burden of proof, the trial court relied on a number of federal courts that have held that, in determining whether a defendant is competent to waive further legal proceedings in a capital case, "[i]nitially sufficient evidence must be presented to cause the court to conduct an inquiry. After that point, it . . . is for the court to determine by a preponderance of the evidence whether the petitioner is mentally competent to withdraw his petition. . . . [A] presumption of competency does not apply . . . . Instead, the question is whether, giving full and fair consideration to all of the

evidence, does it establish by a preponderance that [the defendant] is competent to . . . waive further legal review of his convictions and sentences." (Citation omitted; internal quotation marks omitted.) *Comer* v. *Stewart*, 230 F. Sup. 2d 1016, 1037–38 (D. Ariz. 2002), quoting *Mason* v. *Vasquez*, 5 F.3d 1220, 1225 (9th Cir. 1993).[20] The state argues to the contrary that there is a presumption of competence until the defendant is executed, regardless of whether a threshold showing of incompetence has been made. Cf. *Ford* v. *Wainwright*, 477 U.S. 399, 426, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (presumption of sanity applies until defendant is executed in death penalty case). Because we conclude in this case that the trial court's determination that the preponderance of the evidence established that the defendant's mental disorder did not substantially affect his volitional capacity so as to render him incompetent was not clearly erroneous, we need not decide whether the court should have placed the burden of proof on special counsel.

We now turn to a review of the trial court's analysis of the evidence. The trial court found that all four testifying psychiatrists agreed that the defendant suffered from sexual sadism, depression or mood disorder, personality disorder with narcissistic, borderline and antisocial traits and anxiety disorder. Although the experts disagreed about the precise degree of the severity of the defendant's narcissistic disorder, their disagreement on that issue was not substantial. The experts also agreed that the defendant's cognitive ability was not impaired.

[20] The courts in *Comer* and *Mason* stated that neither party had the burden of proof in a hearing to determine the competency of a defendant to waive postconviction legal proceedings in a capital case. *Mason* v. *Vasquez*, supra, 5 F.3d 1225; *Comer* v. *Stewart*, supra, 230 F. Sup. 1038. The courts also stated, however, that they were required to determine by a preponderance of the evidence that the defendant was competent. As the trial court in the present case recognized, that standard effectively places the burden of proof on the party or parties claiming competence.

The major area of disagreement was whether the defendant's narcissistic traits, including his grandiosity, inability to empathize, self-centeredness and arrogance, substantially affected his ability to act on a rational decision whether to waive further legal proceedings. Grassian testified that, on the basis of his investigation,[21] it was his opinion that the defendant's narcissism made it impossible for him to back down from his decision to waive further legal proceedings even though the conditions of his life have improved since the time that he made his decision and he now would like to live.[22] Specifically, Grassian believed that the defendant's grandiosity required him to take a stand that would be perceived as moral and noble, even though, in fact, he had absolutely no empathy for the families of his

---

[21] Grassian testified that he interviewed the defendant, talked with Dan Ross by telephone, toured death row, reviewed Norko's earlier psychiatric reports and his videotaped interviews with the defendant, reviewed reports prepared by other psychiatrists who have been involved in the case and reviewed the defendant's writings and correspondence with various people in preparation for his testimony.

[22] Grassian's report stated that, since the defendant had moved to Osborn correctional institution in 2003, "[h]e is the only prisoner on his tier; thus he is not subject to the verbal abuse and taunts which oppressed him at Northern [correctional institution]. Moreover, he has a [c]orrections [o]fficer sitting right outside his cell [twenty-four] hours a day seven days a week. . . . [T]he [o]fficers who have this assignment were specially picked, with special attention to their ability to relate well to [the defendant].

"Moreover, one of three mental health clinicians . . . spends about one hour each day, seven days a week, with [the defendant] . . . ." Goldsmith testified that the defendant's "narcissistic needs [were] met in so many ways when he [moved] to Osborn. There's lots of activity around him. He has selected correction officers who deal with him. He has lots of visits, standard visits, lots of legal visits. People come back into his life. There's lots of activity . . . outside the prison, all about him."

In addition, Susan P., the defendant's girlfriend, testified that she had resumed her relationship with the defendant in January, 2005, after breaking it off in 2002. The defendant wrote a letter dated March 7, 2005, to Susan P., in which he stated: "I want so badly to stay here with you. . . . I want to see if you will stick around this time. But I cannot have what I want, unless I hurt someone else."

victims.[23] He further testified that the defendant's narcissism made it impossible for him to bear the public humiliation of reneging on his decision.[24] Goldsmith's testimony was substantially consistent with Grassian's testimony. Both Grassian and Goldsmith concluded that the defendant's decision was "not voluntary" as a result of his narcissistic disorder.

Norko, who has been involved in this case since 1995; see *State* v. *Ross,* supra, 272 Conn. 588–90 (discussing Norko's prior involvement in this case); and Gentile also testified that the defendant's narcissism impairs his ability to empathize and that he is concerned about how he is perceived by others. They did not believe, however, that his narcissism rendered him incapable of empathy or of making a moral decision based on genuine spiritual and religious beliefs. Both Norko and Gentile identified several reasons given by the defendant for wanting to waive further legal proceedings, including his desire to do the morally right thing, to spare further pain to the families of the victims, to avoid another public airing of the horrific details of the crimes, to avoid growing old in prison, and to accept

---

[23] Grassian testified that his belief that the defendant was incapable of empathy was based on the facts that the defendant was a serial rapist and murderer, that he had never admitted that he committed a crime or "come to grips" with his own failings, and that he had continued to publish articles and grant television interviews despite the fact that he had been told that he was hurting both the families of the victims and his own family. Grassian further testified that he believed that the defendant's desire to avoid another death penalty hearing was not, as he professed, driven by concern for the families but was driven by his desire to avoid being publicly humiliated and vilified again.

[24] The Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) § 301.81, p. 659, published by the American Psychiatric Association, provides: "Vulnerability in self-esteem makes individuals with Narcissistic Personality Disorder very sensitive to 'injury' from criticism or defeat. Although they may not show it outwardly, criticism may haunt these individuals and may leave them feeling humiliated, degraded, hollow, and empty. They may react with disdain, rage, or defiant counterattack." This portion of the manual was read into the record during Gentile's testimony.

the inevitability of the death penalty. They acknowledged that the defendant occasionally expressed ambivalence about his decision, but concluded that that was normal and supported the conclusion that his decision was logical and rational, and not driven by an irrational compulsion. Norko believed that when the defendant stated that he had no choice but to accept the imposition of the death penalty, he meant only that it was his moral obligation to end the legal proceedings. Both Norko and Gentile concluded that the defendant's narcissism did not have a substantial effect on his ability to make and follow through on rational choices.

The trial court also took note of the voluminous writings by the defendant that were placed into evidence. At certain times during his incarceration, the defendant wrote monthly letters, entitled "Walking with Michael," in which he reported developments in this case and in his life, expressed his feelings about his situation and set forth religious thoughts and quotes. The defendant would send the letters to a friend who would then distribute them to up to 150 friends and supporters. In his writings, the defendant consistently expressed his desire to spare the families of his victims the pain of another penalty hearing. Grassian and Goldsmith saw these writings as evidence of the defendant's inability to empathize, while Norko and Gentile saw them as evidence of the defendant's genuine feelings.

Finally, the trial court noted that Dan Ross, Elliot and Susan P. all believed that the defendant's stated motivations for ending legal proceedings were false. Because these witnesses were opposed to the death penalty and were friends or family of the defendant, the trial court concluded that "[t]hey do not present as unbiased witnesses to this court."[25]

---

[25] Special counsel claims that the trial court's refusal to accord any weight to the testimony of these witnesses was not based on any findings of demeanor, hesitation in answers or other in-court conduct and that this court may, therefore, make its own determination as to the weight to give

The trial court concluded that the testimony of Norko and Gentile was more persuasive than the testimony of Grassian and Goldsmith and found by a preponderance of the evidence that, although the defendant suffers from mental disorders, none of the disorders, taken individually or together, substantially affected his understanding of his legal position and the options available to him or substantially affected his ability to make a rational choice among his options. It further concluded that the defendant's decision was "the product of a rational intellect and an unconstrained will . . . . [His] mental condition is not coloring his free will and dictating the outcome."

Upon careful review of the transcripts and exhibits, we conclude that the trial court reasonably could have determined that the testimony of Grassian and Goldsmith that the defendant had absolutely no ability to empathize with the families of the victims and that his stated moral and religious beliefs were entirely fraudulent was not as persuasive as the testimony of Norko and Gentile that the defendant's moral and religious sensibilities have developed over time and, although his ability to empathize is limited, it is not entirely lacking. The defendant personally testified before the trial court, which had the opportunity to gauge his appearance, demeanor, emotional affect and vocal inflections and to determine whether they were consistent with the conclusions drawn by Norko and Gentile.

to the testimony. Special counsel does not identify any portions of their testimony, however, that he believes would have changed the trial court's determination that the defendant was competent if the court had given the testimony greater weight. Our review of the testimony of these lay witnesses reveals that it was consistent with the testimony of Norko and Gentile that, on the one hand, the defendant can be self-centered and lacking in empathy and is ambivalent about the consequences of waiving further challenges to his death sentences, but that, on the other hand, he also is capable of expressing care and concern for others and believes that his decision is a moral one.

Moreover, the record as a whole tended to show that the defendant has been able to develop numerous long-term friendships with people who care deeply about him and to maintain at least some contact with his family, which the trial court reasonably could have concluded would be inconsistent with a complete lack of empathy or moral sense. Accordingly, the trial court reasonably could have credited the defendant's repeated statements that his decision was driven in part by a moral desire to spare further pain to the families of his victims. None of the experts suggested that an immutable moral stance would constitute a mental disorder impairing the defendant's volitional capacity. Moreover, all of the experts agreed that the defendant's decision was driven at least in part by his own desires to appear noble and to avoid the mental pain and humiliation of permanent confinement and the possibility of yet another confrontation with the families for yet another public airing of the details of his horrendous crimes. The trial court was not compelled to conclude that these reasons were irrational or that, in the absence of a volitional impairment, they would necessarily be overridden by the defendant's conflicting desires to live and to indulge the wishes of his friends and family to remain among them. Accordingly, we conclude that the trial court's determination that the preponderance of the evidence established that the defendant's mental disorder did not substantially affect his capacity to make and act on a rational decision so as to render him incompetent was supported by the evidence and was not clearly erroneous.

The judgment is affirmed.

In this opinion VERTEFEUILLE, ZARELLA, LAVERY and FLYNN, Js., concurred.

DRANGINIS, J., concurring in the judgment. In concurring in today's judgment, I in no way am abandoning

my belief, or the reasoning underlying it, that our statutory scheme does not permit a death sentenced defendant to waive the benefit that could result from the consolidated habeas litigation, ordered by this court, challenging the constitutionality of the administration of Connecticut's death penalty system. See *In re Application for Writ of Habeas Corpus by Dan Ross*, 272 Conn. 676, 717, 866 A.2d 554 (2005) (*Lavery* and *Dranginis, Js.*, dissenting). Nonetheless, because that issue presently is not before the court, I do not base my decision today on that issue. Rather, I address solely the issues with which we are confronted and those that are necessary to our resolution of the claims on appeal.

The court today develops a new rule limiting the ability of a defendant to challenge as involuntary any waiver of a constitutional right. Because I believe that it is unnecessary for this court to decide the issue and because I believe that such a general rule is unwise, I decline to join in the court's opinion. In so far as the court has concluded that special counsel has standing to appeal the trial court's ruling, I join with the court. I also adopt, for purposes of this opinion, the majority's recitation of the facts and procedural history of this case.

I agree with the majority that, although special counsel has framed the issue as one of voluntariness, the arguments made by special counsel are dependent on challenging the subsidiary facts found by the trial court that underlie its determination that the defendant's mental disorders, taken separately or together, do not affect substantially his ability to make rational choices. This argument challenges the factual determination of the defendant's volitional capacity as it relates to his competence, not whether, as a matter of law, his waiver was voluntary. See *Rumbaugh* v. *Procunier*, 753 F.2d 395, 399 (5th Cir.) (determination as to whether defendant suffers from mental disease that impairs his ability

to make rational decision to waive further challenges to death sentence must be accepted unless clearly erroneous), cert. denied sub nom. *Rumbaugh* v. *McCotter*, 473 U.S. 919, 105 S. Ct. 3544, 87 L. Ed. 2d 668 (1985). As the majority has noted, our standard of review, therefore, on the issue of volitional capacity as it relates to the defendant's competence is whether the trial court's finding that the defendant has volitional capacity was clearly erroneous. Id.; see also *Demosthenes* v. *Baal*, 495 U.S. 731, 735, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990) (state court's conclusion regarding defendant's competency to waive further challenges to death sentence is finding of fact entitled to presumption of correctness). Only after the court concludes that the defendant is competent because he possesses volitional capacity, do we review the trial court's conclusion that the defendant's waiver was voluntary under a de novo standard of review. See *State* v. *Cobb* 251 Conn. 285, 358–59, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

I

The majority has concluded that the defendant is competent and his waiver was voluntary. While I agree with the majority's conclusion that the defendant's waiver was voluntary, I disagree with the reasoning it employs in order to reach that end.

Generally, a finding of competency and a determination of whether waiver of a constitutional right was knowing, intelligent and voluntary, is a two step process, with the competency determination being a separate and distinct inquiry. *Godinez* v. *Moran*, 509 U.S. 389, 400–401, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (standard of competency to waive right to counsel). This is because, in most circumstances, the level of competency required to waive a constitutional right is the same competency required to stand trial. Id., 398.

To be competent, therefore, a defendant merely must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . [have] a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960).

Although never specifically addressed, the degree of competency an individual must possess in order to waive remaining challenges to his death sentence has evolved into a somewhat different if not a somewhat higher standard. In *Rees* v. *Peyton*, 384 U.S. 312, 314, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966), the United States Supreme Court stated that the question of the defendant's competence was "whether he has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." Several Courts of Appeal have adopted a three part inquiry to determine whether any individual defendant meets this standard of competence. This three part inquiry, first developed by the United States Court of Appeals for the Fifth Circuit, asks:

"(1) Is the person suffering from a mental disease or defect?

"(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

"(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?"

*Rumbaugh* v. *Procunier*, supra, 753 F.2d 398.[1] The court in *Rumbaugh* concluded that the third prong of this inquiry contained a volitional component; id.; a component not readily contained in the *Dusky* standard of competency. This third prong of the *Rumbaugh* competency inquiry, whether by design or consequence, lays the factual predicate necessary to determine whether, as a matter of law, a defendant's waiver of further challenges to his death sentence is voluntary.

In the present case, because the majority concludes that the trial court reasonably could have found that the defendant possesses the volitional capacity necessary for competency under *Rumbaugh*'s third factor, it also concludes that the defendant's waiver must have been voluntary unless evidence of external coercion existed. Under a competency standard where volition is considered and given great weight, this conclusion is logical. After all, if the defendant has the volitional capacity to make a reasoned choice, he also must have the volitional capacity to effect a voluntary waiver. The majority's conclusion, therefore, that external coercion is a necessary factual predicate to a determination of involuntary waiver, is of little significance until one realizes that the majority's conclusion applies to *all* waivers of constitutional rights, not only to the waiver of further challenges to sentences of death.

To see that this is the effect of the majority's conclusion, one need only look so far as the cases to which they cite for the proposition that external coercion is

---

[1] Both the Second Circuit and this court have neither adopted nor rejected the *Rumbaugh* three part inquiry. The only other circuit to have addressed the adoption or rejection of the *Rumbaugh* analysis explicitly is the Eleventh Circuit, which has adopted it. See *Lonchar* v. *Zant*, 978 F.2d 637, 641–42 (11th Cir. 1992). The Ninth Circuit has neither adopted nor rejected the *Rumbaugh* formulation, though, like this court, it used the three part test when that test was used by a District Court considering a death sentenced defendant's competency. See *Dennis* v. *Budge*, 378 F.3d 880, 888 n.4 (9th Cir.), cert. denied, 542 U.S. 959, 125 S. Ct. 16, 159 L. Ed. 2d 847 (2004).

a necessary predicate finding to a determination of involuntary waiver. The case on which the majority relies is *Colorado* v. *Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), which held that government coercion or state action was necessary for a determination that a *confession or waiver of Miranda rights* was involuntary under federal constitutional law. The *Connelly* court explained that because the main threat in the area of involuntary confessions is police overreaching, it logically follows that where no police coercion exists, a confession cannot be involuntary. Id., 164. This, however, is not the case in all situations where waiver is necessary. For example, a threat of government coercion rarely exists where a defendant wishes to waive his right to counsel. Such a waiver, nonetheless, must be knowing, intelligent and *voluntary*. See *Godinez* v. *Moran*, supra, 509 U.S. 402. The defendant desiring to waive counsel, however, need not show volitional capacity, for the competency standard by which he is evaluated is the *Dusky* standard, not the *Rumbaugh* standard. Such an individual may have a mental disease or defect that does not impair his ability to develop a basic understanding of the proceedings in which he is involved; *Dusky* v. *United States*, supra, 362 U.S. 402; yet that same disease or defect may affect substantially his volitional capacity. Because volitional capacity is not at issue in the determination of his competency, this impairment can be addressed solely through a determination that his waiver of his right to counsel is not voluntary. Under the new rule adopted by the majority, however, this impairment is of no consequence. Unless the state has taken affirmative action to force the defendant's hand in waiving his right to counsel, it is of no significance that the defendant is incapable of exercising free will. I cannot agree with such a formulation.

In setting forth this new rule, the majority is writing on a blank page of federal law. The United States

Supreme Court has not extended *Connelly* to this extent, nor has any Circuit Court of Appeals. In making this ruling, the majority also is doing as a matter of federal law what this court has been loathe to do as a matter of state law. To date, this court has not adopted the *Connelly* limitations on voluntariness, even in the area of confessions, as a matter of state law. Each time it has been faced with the question, it has declined to rule one way or the other. See *State* v. *Roseboro*, 221 Conn. 430, 443–44, 604 A.2d 1286 (1992); *State* v. *Northrop*, 213 Conn. 405, 419–20, 568 A.2d 439 (1990); *State* v. *Gonzalez*, 206 Conn. 213, 222, 537 A.2d 460 (1988). Furthermore, there is no need to develop this new requirement. In ruling that the defendant's waiver was voluntary, the trial court did not depend on the nonexistence of external factors, nor is this conclusion necessary to a determination that the defendant's waiver was voluntary. Rather, as indicated previously, it is enough to recognize that in a death penalty situation, where a more rigorous standard of competency is utilized, the predicate facts supporting a finding that the defendant has the volitional capacity necessary for competence also support the ultimate conclusion that the defendant is able to effect a voluntary waiver.

## II

I agree with the majority's conclusion, and the reasoning it employs, that the trial court's determination that the defendant is competent was not clearly erroneous. Because I disagree with the majority that a waiver is voluntary absent state coercion, I also reach the question of whether, as a matter of law, the defendant's waiver was voluntary. I conclude that it was.

"The standard for an effective waiver . . . is that it must be knowing and intelligent, as well as voluntary. . . . Relying on the standard articulated in *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461

(1938), we have adopted the definition of a valid waiver . . . as the intentional relinquishment or abandonment of a known right. . . . In determining whether this strict standard has been met, a court must inquire into the totality of the circumstances of each case." (Citations omitted; internal quotation marks omitted.) *State v. Ouellette*, 271 Conn. 740, 752, 859 A.2d 907 (2004). Some of the factors that comprise the "totality of the circumstances" include but are not limited to: (1) the defendant's experience and familiarity with the legal system; (2) the defendant's level of intelligence, including his IQ; (3) his age; (4) his level of education; (5) his emotional state; and (6) the existence of any mental disease, disorder or defect. *State v. Toste*, 198 Conn. 573, 580–81, 504 A.2d 1036 (1986). In evaluating whether, as a matter of law, the state has proved waiver by a preponderance of the evidence, we defer to the trial court's findings on subsidiary factual questions, such as those that laid the foundation for the court's determination that the defendant possesses volitional capacity. See *Colorado v. Connelly*, supra, 479 U.S. 168; *State v. Whitaker*, 215 Conn. 739, 753, 578 A.2d 1031 (1990).

Reviewing the record in light of these factors, I conclude that the state has met its burden of proving that the defendant's waiver was voluntary by a preponderance of the evidence. Although not at issue in this appeal, it is clear from the defendant's own testimony, as well as the testimony of all four psychiatrists, that the defendant can effect a knowing and intelligent waiver, as he has a thorough understanding of all his legal options and the consequences of exercising or not exercising any one of those options. Furthermore, the subsidiary facts that provided the bases for the trial court's conclusion that the defendant has the necessary volitional capacity to be competent to waive further appeals and collateral challenges to his sentences of death, as well as the lack of any evidence of death row

syndrome or segregated housing unit syndrome, leads me to conclude that, as a matter of law, his waiver of further challenges is a voluntary one that meets the standards of *Johnson* v. *Zerbst*, supra, 304 U.S. 464.

I, therefore, concur in the judgment.

NORCOTT, J., concurring and dissenting. My position on the death penalty should be of no surprise even to the most casual reader of the Connecticut Reports because, in my nearly thirteen years as a member of this court, I have written exhaustively of my "long-standing belief that the death penalty has no place what-soever in a civilized and rational criminal justice system . . . ."[1] *State* v. *Ross*, 272 Conn. 577, 613, 863 A.2d 654 (2005) (*Norcott, J.,* concurring). I agree with the majority's well reasoned resolution of the jurisdictional and competency issues that this case presents us with, despite the ineluctable fact that this court's decision in the present case clears one of the last remaining obstacles to Connecticut's first execution in nearly forty-five years. I write separately not to repeat any

---

[1] See *In re Application for Writ of Habeas Corpus by Dan Ross*, 272 Conn. 676, 690–716, 866 A.2d 554 (2005) (*Norcott, J.,* dissenting from order); *State* v. *Peeler*, 271 Conn. 338, 464, 857 A.2d 808 (2004) (*Katz, J.,* with whom *Norcott, J.,* joins, dissenting); *State* v. *Ross*, 269 Conn. 213, 392–93, 849 A.2d 648 (2004) (*Norcott, J.,* dissenting); *State* v. *Breton*, 264 Conn. 327, 446–49, 824 A.2d 778 (*Norcott, J.,* dissenting), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Webb*, 252 Conn. 128, 147, 750 A.2d 448 (*Norcott, J.,* dissenting), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); *State* v. *Griffin*, 251 Conn. 671, 742–48, 741 A.2d 913 (1999) (*Norcott, J.,* dissenting); *State* v. *Ross*, 251 Conn. 579, 597, 742 A.2d 312 (1999) (*Norcott, J.,* dissenting); *State* v. *Cobb*, 251 Conn. 285, 543–52, 743 A.2d 1 (1999) (*Norcott, J.,* dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 566–70, 680 A.2d 147 (1996) (*Norcott, J.,* dissenting); see also *State* v. *Ross*, 272 Conn. 577, 613–16, 863 A.2d 654 (2005) (*Norcott, J.,* concurring); *State* v. *Colon*, 272 Conn. 106, 395, 864 A.2d 666 (2004) (*Norcott, J.,* concurring); *State* v. *Rizzo*, 266 Conn. 171, 313–14, 833 A.2d 363 (2003) (*Norcott, J.,* concurring); *State* v. *Courchesne*, 262 Conn. 537, 583–84, 816 A.2d 562 (2003) (*Norcott, J.,* con-curring).

arguments that I previously have made in other opinions, but only to state that the present case is a paradigmatic illustration of how the death penalty is an "incredibly costly, frustratingly lengthy and emotionally draining part of our criminal jurisprudence." *State* v. *Ross*, 269 Conn. 213, 394, 849 A.2d 648 (2004) (*Norcott, J.*, dissenting). Accordingly, I dissent from the result of the majority decision, because it will lead to the execution of a human being at the hands of the state of Connecticut.

In most ordinary litigation, civil or criminal, a party's decision to accept or to stipulate to a certain result either simplifies greatly or resolves finally the proceedings.[2] The defendant, Michael Ross, is, however, no ordinary defendant, and this is no ordinary case. See, e.g., *State* v. *Rizzo*, 266 Conn. 171, 226, 833 A.2d 363 (2003) ("[d]eath is different"). This case illustrates, however, the sheer irrationality of the capital punishment system because this defendant's election to forgo further appeals or collateral relief, a decision that in any other context would lend some economy to the proceedings, has in fact spawned seemingly endless litigation over his fate. This defendant's choice has led to: (1) competency hearings before the trial court in October and December, 2004, which were reviewed by this court following the filing of a writ of error by the office of the chief public defender, who had sought to enter the case as the defendant's next friend;[3] (2) separate state habeas corpus proceedings brought by the office of the chief public defender and the defendant's father, both of which subsequently were reviewed by

---

[2] This is, of course, subject to certain well established constitutional safeguards in the criminal context. See, e.g., *State* v. *Johnson*, 253 Conn. 1, 34–35, 751 A.2d 298 (2000) (discussing "axiomatic" constitutional principles from *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 [1969], that require canvass of accused to determine that guilty plea is made knowingly and voluntarily).

[3] *State* v. *Ross*, supra, 272 Conn. 581–96.

this court following writs of error;[4] (3) a separate pro-
ceeding brought against the board of pardons and
paroles;[5] (4) the most recent six day competency hear-
ing, presently under review in this appeal; and (5) a
variety of collateral proceedings in the federal courts,
from the local District Court through to the United
States Supreme Court.[6] I do not dispute the need for
an abundance of caution given the tremendous stakes
of this case; indeed, after the execution has taken place,
no court will have the option of reconsideration. These
proceedings have, however, been cruel and traumatic
for the victims' families and a significant part of the
punishment for the defendant himself, and also have
come at great financial cost for all parties involved, as
well as the courts. And yet, at the end of the day, the
question remains: After the execution, what will the
state of Connecticut have gained from all of this? The
answer seems to be that, minimally, the state has
secured the proverbial pound of flesh for the crimes of
this one outrageously cruel man. But now, what is to
be? Has our thirst for this ultimate penalty now been
slaked, or do we, the people of Connecticut, continue
down this increasingly lonesome road?

I opened this opinion by mentioning that my opposi-
tion to the death penalty has often been set forth in the

[4] *In re Application for Writ of Habeas Corpus by Dan Ross*, 272 Conn.
653, 866 A.2d 542 (2005).

[5] *Missionary Society of Connecticut v. Board of Pardons & Paroles*, 272
Conn. 647, 866 A.2d 538 (2005).

[6] *Ross v. Connecticut*, 543 U.S. 1046, 125 S. Ct. 943, 160 L. Ed. 2d 766
(2005) (denying public defenders' motions to defer consideration of petition
and for leave to proceed in forma pauperis without affidavit of indigency
executed by petitioner); *Rell v. Ross*, 543 U.S. 1134, 125 S. Ct. 1117, 160 L.
Ed. 2d 1091 (2005) (vacating temporary stay of execution obtained from
United States Court of Appeals for Second Circuit by Dan Ross); *Ross v.
Rell*, 543 U.S. 1134, 125 S. Ct. 1117, 160 L. Ed. 2d 1092 (2005) (denying
application for stay of execution or temporary restraining order); *Lantz v.
Ross*, 543 U.S. 1134, 125 S. Ct. 1117, 160 L. Ed. 2d 1091 (2005) (vacating
stay obtained by public defenders); see also *Ross v. Rell*, United States
District Court, Docket No. 3:04CV2186, 2005 U.S. Dist. LEXIS 245 (D. Conn.
January 10, 2005) (denying application of defendant's father to proceed as
next friend).

724

Connecticut Reports. I close with my belief that the totality of the costs that are attendant to capital punishment vastly outweigh its marginal benefits. Hopefully, the death penalty jurisprudence reported in those volumes soon will become nothing more than legal artifacts of interest and import not to the active bench and bar, but only to historians. Until such time, however, I respectfully dissent.