## In re CHARGES OF JUDICIAL MISCONDUCT.

### Nos. 05–8512 to 05–8517, 05–8519.

United States Court of Appeals, Second Circuit.

July 26, 2006.

Before: The Judicial Council of the Second Circuit.*

### ORDER

Seven complaints of judicial misconduct were filed against a district judge of this Circuit, Chief Judge Robert N. Chatigny of the United States District Court for the District of Connecticut, pursuant to 28 U.S.C. § 351 and the Rules of the Judicial Council of the Second Circuit Governing Complaints Against Judicial Officers ("Local Rules").

Pursuant to 28 U.S.C. § 353(a) and Local Rule 9, Chief Judge John M. Walker, Jr., United States Court of Appeals for the Second Circuit, appointed a special committee to investigate the facts and the allegations contained in the above-referenced complaints. The Special Committee consisted of Chief Judge Walker, Circuit Judge Pierre N. Leval, and Chief District Judge Michael B. Mukasey of the United States District Court for the Southern District of New York. The Special Committee has submitted its Report to the Judicial Council, pursuant to 28 U.S.C. § 353(c) and Local Rule 10(e).

The Judicial Council of the Second Circuit, after full consideration of the issues raised in the above-referenced complaints,

Second Circuit. As the subject of these complaints, however, he did not participate in these proceedings of the Judicial Council.

and for the reasons set forth in the Report of the Special Committee, finds no misconduct as to any of the claims.

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Report of the Special Committee is **ADOPTED** and, for the reasons stated therein, the Judicial Council finds no misconduct. The above-referenced complaints are hereby **DISMISSED.**

**IT IS FURTHER ORDERED** that the Special Committee's Report and this Order shall be released to the public, as authorized by the Chief Judge of the Second Circuit and agreed to in writing by Judge Chatigny, the judge who is the subject of the complaints, pursuant to 28 U.S.C. § 360(a) and Local Rule 17.

**SO ORDERED.**

## APPENDIX

## REPORT OF SPECIAL COMMITTEE

### Table of Contents

I.   *Statement of Claims to be Adjudicated* ........................................534

II.   *General Principles Governing Misconduct Proceedings* ........................537

III.   *Discussion of Specifications and Recommendations of Committee* ............538
    A.   Whether Judge Chatigny violated 28 U.S.C. § 455 by not, *ab initio*, disclosing his prior involvement with Ross's state criminal proceedings or recusing himself from the two district court actions based on that prior involvement ....................................................538
    B.   Whether Judge Chatigny improperly threatened Paulding with disbarment if he did not pursue particular issues ........................541
    C.   Whether Judge Chatigny interfered with Ross's constitutional right to representation by counsel of his choice ...............................547
    D.   Whether, during the proceedings, Judge Chatigny "abandoned the role of neutral and detached magistrate and instead became an advocate for the position held by the parties who were seeking to stop the execution." ........................................................549
    E.   Whether, after Judge Chatigny's stay orders had been vacated, Judge Chatigny lacked authority to proceed on January 28, 2005, "in the absence of any motion by a party or an Article III case or controversy." .......................................................552
    F.   Whether Judge Chatigny defied, and effectively overturned, the appellate court rulings vacating his stays of execution through the use of threats and intimidation ....................................................553

IV.   *Release of Judicial Council Decision to Public* ...............................553

V.   *Conclusion* ................................................................554

This report is submitted to the Judicial Council of the Second Circuit, pursuant to 28 U.S.C. § 353(c) and Rule 10(e) of the Rules of the Judicial Council of the Second Circuit Governing Complaints Against Judicial Officers ("the Local Rules"), by the special committee appointed by Chief Judge John M. Walker, Jr., to investigate the allegations in the above-referenced complaints that District Judge Robert N. Chatigny engaged in judicial misconduct. The special committee ("the Committee") consisted of Chief Judge Walker, Circuit Judge Pierre N. Leval, and Chief Judge

Michael B. Mukasey of the United States District Court for the Southern District of New York. Michael Zachary, a supervisory staff attorney for the Court of Appeals, was appointed counsel to the Committee pursuant to Local Rule 10(c). Judge Chatigny is represented by Jacob D. Zeldes and David P. Atkins of the firm of Zeldes, Needle & Cooper.

As required by 28 U.S.C. § 353(c), the Committee has "conduct[ed] an investigation as extensive as it considers necessary" and presents in this report "both the findings of the investigation and the [C]ommittee's recommendations for necessary and appropriate action by the judicial council."

## I. *Statement of Claims to be Adjudicated*

The seven complaints under consideration contain identical statements of facts and claims. The Complainant in the proceeding docketed under 05–8519 was granted leave to amend his complaint to present additional misconduct allegations. All of the allegations concern Judge Chatigny's conduct in two district court actions—one a habeas corpus action under 28 U.S.C. § 2254 and the other a civil rights action under 42 U.S.C. § 1983— both challenging the imminent execution of Michael Ross, who had been convicted in Connecticut state court, and sentenced to death, for murdering three girls and a nineteen-year-old woman after kidnapping and/or sexually assaulting them. *See State v. Ross*, 269 Conn. 213, 849 A.2d 648 (2004). After lengthy proceedings in the State and federal courts, Ross had decided to cease further challenges and to proceed to his execution.

A few days before Ross's execution was to take place, these two actions were filed in federal court by persons other than Ross and were assigned to Judge Chatigny. In both actions the plaintiffs claimed that Ross was not competent and that his decision to waive any legal rights therefore should not be credited.

The § 2254 action was brought on Ross's behalf by a person, claiming "next friend" standing, asserting, *inter alia*, that Ross was not competent to waive further challenges to his death sentence. *See Ross v. Lantz*, No. 05–cv–0116 (D. Conn. filed Jan. 21, 2005) (Petition). In the § 1983 action, Ross's father claimed that the planned execution would violate his, the father's, due process and equal protection rights, based on, *inter alia*, Ross's alleged lack of volitional capacity and competence to waive further challenges to the execution. *See Ross v. Rell*, No. 05–cv–0130 (D. Conn. filed Jan. 25, 2005) (Complaint). Ross's interests were represented in the two actions by his attorney, T.R. Paulding, Esq.[1]

---

**1.** Paulding represented Ross on a *pro bono* basis from February 2004 until Ross's execution in May 2005. Under the circumstances of this highly contentious case, his *pro bono* service entitles him to our commendation. Although Paulding's ethical obligations were central to several issues in this matter, the Committee stresses that it does not call into question his compliance with those obligations. From Paulding's point of view, he faced a dilemma with regard to his ethical obligations. On the basis of his long experience and familiarity with his client, Ross, he was persuaded of his client's competence. Paulding therefore considered himself ethically bound to respect his client's instruction to bring no further challenges and to resist the pressure exerted by Judge Chatigny to pursue the doubts the judge had about Ross's competency. Our finding that the judge committed no misconduct in no ways implies that Paulding was derelict in the conduct of his duties. The simple fact is that those highly unusual circumstances created dilemmas for both the lawyer and the judge.

The proceedings which were the basis of the charges against Judge Chatigny were highly unusual and emotional. This was the first death penalty to be carried out in the state of Connecticut in over 40 years. As noted, these events occurred days before Ross's scheduled execution. Although Ross's competence previously had been determined by the Connecticut courts, three new pieces of pertinent evidence came before Judge Chatigny—a psychiatrist's testimony, a letter from a prisoner at Ross's institution, and a statement from a retired prison official, all of which supported the assertion that Ross's competence was impaired.

Given the new evidence raising the possibility that Ross may have become incompetent and therefore not legally able to waive legal rights, Judge Chatigny became persuaded that, before Ross could be permitted to proceed to his execution without raising available legal challenges, his continued competency needed to be confirmed. His lawyer Paulding, however, believed himself bound to carry out his client's instructions and was refusing to take steps to pursue and test the new evidence supporting incompetence. The judge believed that, in the face of evidence suggesting Ross's incompetence, Ross's attorney was obligated to investigate Ross's competence before following Ross's instructions to waive all challenges to his execution. The proceedings that are the focus of the complaints involve Judge Chatigny's efforts to persuade Paulding that he was professionally obligated to pursue the evidence indicating possible incompetence. These efforts were ultimately successful: further competency hearings ensued, prior to Ross's eventual execution.

The Complainants are attorneys in the Connecticut Division of Criminal Justice and the Office of the Chief State's Attorney—the office which conducted the prosecution of Ross and defended the two actions in question.[2]

The principal specifications of the Complaints fall essentially into three categories. First, they allege that Judge Chatigny committed misconduct in failing to recuse himself (or at least reveal the facts) where, 13 years earlier, as an attorney in private practice representing the Connecticut Criminal Defense Lawyers Association ("CCDLA") he had had a brief involvement in Ross's case. Second, the Complaints allege that Judge Chatigny's efforts to persuade Paulding to investigate and pursue the issue of Ross's competence included improper threatening conduct and interfered with both Paulding's rights as counsel and Ross's right to choose his counsel. Third, the Complaints allege that in the course of these proceedings Judge Chatigny abandoned neutrality and became an advocate on behalf of saving Ross from execution, exceeding his judicial authority and defying the rulings of higher courts. Specifically, the Complaints make the following allegations:

**A. Judge Chatigny violated 28 U.S.C. § 455 by not, *ab initio*, disclosing his prior involvement with Ross's state criminal proceedings or recusing himself from the two district court actions based on that prior involvement.** *See* amendment to complaint docketed under 05–8519, filed June 9, 2005.

---

**2.** Of the Complainants, two were among the attorneys representing the State of Connecticut in the § 2254 action; three were among the attorneys representing the State in Ross's state court criminal proceedings; one represented the State in both.

**B. Judge Chatigny improperly threatened Paulding with disbarment if he did not present the arguments proposed by the Judge.** *See* complaints at 4–5 (supporting allegations at 4–5, and claim partially incorporated by claims 2 and 3 at bottom of 5).

**C. Judge Chatigny's "attempt to direct the manner in which ... Paulding advised [Ross] constituted blatant interference with Michael Ross's constitutional right to representation by counsel of his choice."** *See* complaints at 5.

**D. During the proceedings, Judge Chatigny "completely abandoned the role of neutral and detached magistrate and instead became an advocate for the position held by the parties who were seeking to stop the execution."** *See* complaints at 5, and amendments to complaint docketed under 05–8519, filed June 9 and July 6, 2005.

**E. After Judge Chatigny's stay orders had been vacated, he lacked any authority to proceed on January 28, 2005, with the conference that allegedly resulted in Paulding convincing Ross to pursue further state court remedies, in the absence of any motion by a party or an Article III case or controversy.** *Id.* at 2, second full paragraph in bold, and 5, lines 2–4.

**F. "[A]fter having been reversed by higher courts [in appeals from Judge Chatigny's orders staying Ross's execution], Judge Chatigny chose to defy those rulings and effectively overturn them through the use of threats and intimidation."** *See* complaints at 5.

We find the Complaints are without merit. Without doubt Judge Chatigny's actions were unusual. But in the judge's reasonable view, the circumstances thrust on him called for unusual action in discharge of judicial duty to ensure the fair resolution of the important proceeding before him. In ordinary circumstance, a judge relies on the adversary system to ensure that the rights of all parties are protected. Each attorney protects his or her client's rights, and the role of the judge is to consider the arguments advanced on all sides and rule on the litigated questions. Here, however, in the judge's perception, the adversary system was at risk of breaking down. Because of Ross's instruction to waive all legal challenges, his attorney was refusing to take steps to protect Ross's legal rights. In light of the new evidence, however, the possibility existed that Ross was not competent to waive his rights. In the judge's view, unless Paulding were persuaded to pursue the competency issue, Ross might be executed based on waivers he was not competent to give.

We express no view of the legal correctness of the judge's actions. It is fairly arguable, furthermore, that some of what he said was susceptible to misunderstanding and might better have been left unsaid. We are persuaded, however, that the judge's actions were not motivated by any bias in favor of Ross or against the death penalty but only by the judge's reasonable perception that the discharge of his own judicial duty to ensure that the proceeding be resolved in accordance with law required that he take forceful steps to persuade Ross's attorney to take certain steps on Ross's behalf. The issue raised by the Complaints is whether the judge committed misconduct. We are persuaded that he committed no misconduct.

The summary and discussion presented below are based on the following materials: the seven complaints, as supplemented by

the amendments in the proceeding docketed under 05–8519; Judge Chatigny's May 4, 2005 memorandum and July 7, 2005 letter to Chief Judge Walker concerning the allegations in the complaints, and his later sworn affidavit in which he attests that the contents of the May 4, 2005 memorandum and July 7, 2005 letter are true; Judge Chatigny's December 13, 2005 memorandum of law discussing the misconduct charges; affidavits and other evidence obtained from numerous witnesses other than the Complainants and the Judge; the transcripts from the various district court conferences at issue; and various documents and opinions from the two federal actions and related state court proceedings.

Judge Chatigny, through his attorney, has informed the Committee that he does not request a hearing. *See* Dec. 16, 2005 Letter of Jacob D. Zeldes; *see also* 28 U.S.C. § 358(b)(2) (outlining right of judge to attend and participate in "proceedings conducted by the investigating panel"); Local Rule 12 (same). The Complainants have not requested that they be interviewed by a Committee representative or that a hearing be held. *See* Local Rule 13(b), (c) (outlining rights of complainants to be interviewed, to present written or oral argument, and to be called as witnesses at a hearing if they have substantial evidence to offer); 28 U.S.C. § 358(b)(3) (stating that a complainant must "be afforded an opportunity to appear at proceedings conducted by the investigating panel, if the panel concludes that the complainant could offer substantial information"); Order filed Sept. 8, 2005 (Walker, C.J.) (informing complainants of deadline for requesting interview by Committee representative). The Complainants also did not seek to present any further evi-

dence or argument after they were presented with copies of Judge Chatigny's July 7, 2005 letter to Chief Judge Walker, which responded to the misconduct complaints. *See* Order filed Sept. 8, 2005 (Walker, C.J.) (directing that copy of the July 7 letter be provided to each Complainant, and stating that the Committee saw no need for a hearing). No interested party having requested a hearing, or cross-examination, the Committee, which has discretion under the applicable rules to hold a hearing, has determined that a fact-finding hearing would not be useful. *See* Local Rule 11(a). There is no reason to believe that a hearing would produce any further information or provide any further assistance in the resolution of these issues.

## II. *General Principles Governing Misconduct Proceedings*

A federal judge's conduct is sanctionable under the judicial misconduct statutes and rules if it is "prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a); *see also* Local Rule 1(b). A variety of sanctions and corrective actions may be imposed by the Judicial Council, or the Judicial Conference, on a judge who has engaged in judicial misconduct. *See* 28 U.S.C. §§ 354(a)-(b), 355(a); Local Rules 14(a), (e)-(g). Where the Judicial Council finds that misconduct did not occur, or that sanctions are otherwise not required, the Judicial Council may dismiss a claim of misconduct, or "conclude the proceeding" on the grounds that corrective action has been taken or intervening events have made Judicial Council action unnecessary. *See* Local Rule 14(a), (c)-(d); *see also In re Charges of Judicial Misconduct,* 404 F.3d 688, 695–96 & n. 3 (2d Cir. Jud. Council 2005).

**III.** *Discussion of Specifications and Recommendations of Committee*

**A. Whether Judge Chatigny violated 28 U.S.C. § 455 by not, *ab initio*, disclosing his prior involvement with Ross's state criminal proceedings or recusing himself from the two district court actions based on that prior involvement.**

The amendments to the complaint docketed under 05–8519 assert that Judge Chatigny should have recused himself based on, or at least should have revealed, his involvement as an attorney, prior to his appointment as a district judge, with Ross's state court appeal. *See* amendments to complaint docketed under 05–8519, filed June 9 and July 6, 2005. In 1992, Judge Chatigny, then in private practice, acting on behalf of the Connecticut Criminal Defense Lawyers Association ("CCDLA"), filed in the Connecticut Supreme Court an application for leave to file an amicus brief in Ross's direct appeal. Although the leave was granted, no amicus brief was ever filed. *See* June 9, 2005 amendment to complaint in 05–8519 (with attached amicus application and order granting leave to file amicus brief).

The application did not set forth what position the CCDLA intended to take in the appeal. *See id.*, amicus application. It stated simply that the "CCDLA is gravely concerned about the trial court's rulings on significant evidentiary issues in this capital case and the implications of those rulings for the practice of criminal law in this state." *Id.* at 2. Other orders and papers attached to the Complainant's June 9, 2005 amendment reflect that Robert N. Chatigny of Chatigny & Cowdery was then placed on the Connecticut Supreme Court's list of attorneys to be served with papers and was acknowledged as the CCDLA's amicus counsel by Ross's attorney. *See id.*, attached documents dated July 16, 1992, Jan. 18, 1994, and October 13, 1994.

The Complaint asserts that Judge Chatigny's appearance in Ross's case as amicus counsel required his recusal in the federal habeas action under 28 U.S.C. § 455(b)(2), which mandates recusal "[w]here in private practice [the judge] served as lawyer in the matter in controversy." *Id.*, June 9, 2005 amendment at 2 (quoting § 455(b)(2)). Alternatively, the Complaint argues that, even if Judge Chatigny's amicus role does not fall within § 455(b)(2), he was required to fully disclose to the parties to the federal actions his prior role in Ross's direct appeal. *Id.*

In his letter of July 7, 2005, which was addressed to Chief Judge Walker and responded to the charges, Judge Chatigny stated that he had forgotten his brief inconsequential involvement with Ross's direct appeal and would have recused himself had he remembered it. *See* July 7, 2005 Letter from Judge Chatigny to Chief Judge Walker, at 5–6. His letter sets forth the facts as follows. His involvement in Ross's direct appeal resulted from a request made by a friend, David S. Golub, Esq., an attorney who was coordinating the filing of amicus applications in the Ross appeal. The involvement was quite limited. Soon after Chatigny filed a request for leave, "[i]t became apparent ... that there were no issues for [the Chatigny] firm to brief ... that were not already being briefed by others." He "took no further action." In July 1992, responding to a written inquiry sent by Ross, he informed Ross by letter that he was "no longer participating in this matter" and that Golub should be contacted for further

information. *Id.* at 5 (quoting Chatigny letter).

For purposes of the present proceedings, the Committee assumes, without deciding, that, had he remembered his prior involvement, slight as it was, Judge Chatigny should have disclosed the prior appearance and recused himself.[3] However, the Committee finds no misconduct.

A failure to recuse resulting from an innocent and reasonable memory lapse is not misconduct. *See In re Cudahy,* 294 F.3d 947, 952 (7th Cir. Jud. Council 2002) (Posner, J.) (stating that "an erroneous failure to recuse oneself from considering a particular matter is a legal error rather than judicial misconduct").

Judge Chatigny's sworn statement that he had no recollection of his prior involvement is supported by all of the evidence, and his failure of recollection is altogether reasonable based on the circumstances.

We have studied the evidence submitted, which bears on Judge Chatigny's brief involvement, and we find no reason to doubt his sworn statement that, during the conduct of the proceedings before him, he had no recollection of the prior involvement until it was called to his attention by this Complaint. It is true that the Ross case, involving horrifying rapes and murders by a serial killer, was highly unusual and memorable. Nonetheless, Judge Chatigny's personal involvement was fleeting, tangential, and inconsequential, in addition to being long past. He never represented a party; he had no significant contact with any participant in the proceedings; and he never devoted any substantial attention to the case. The extent of the involvement was that he was requested by Golub to file an application to file an amicus brief. He consulted with his partner James Cowdery, Esq., and agreed to do so. He then wrote a *pro forma* application to the court requesting leave to file an amicus brief. Soon thereafter, he and his partner determined there was no issue to be briefed and decided not to pursue the matter any further. Apart from responding to an inquiry letter from Ross by advising Ross that he was "no longer participating," he took no further action in the matter. Especially in view of the fact that this took place thirteen years in the past, it is both understandable and reasonable that Judge Chatigny would have forgotten it. The evidence strongly supports his assertion to that effect. The pertinent evidence submitted on the matter was as follows.

William F. Dow, III, the president of the CCDLA at the time of Ross's direct appeal, stated in an affidavit that he "has no specific recollection of ever dealing with Judge Chatigny in connection with any matters involving the Michael Ross case," and "no recollection whatsoever of ever talking directly with Robert Chatigny about this matter or talking about Robert Chatigny to David Golub as someone who would participate in preparing the amicus

---

**3.** Because we proceed on a different ground and assume for purposes of this report that recusal was required, we have no need to determine whether, under § 455(b)(2), the matter in which Judge Chatigny served as a lawyer was "the matter in controversy." The Committee notes, however, that the applicability of § 455(b)(2) is not clear. *See* Flamm, Judicial Disqualification § 24.4 (1996, supp.

2005) (stating that "precisely what Congress meant by the term 'matter in controversy'—as that term is used in § 455(b)(2)—is not altogether clear") (discussing cases); *Blue Cross & Blue Shield v. Delta Dental,* 248 F.Supp.2d 39, 43 (D.R.I.2003) ("Those courts that have interpreted [§ 455(b)(2)] have widely divergent views with respect to its meaning and application.").

brief on behalf of the CCDLA," and "do[es] not believe [he] ever had any such discussion with then-Attorney Chatigny." Dow Affidavit dated Dec. 2, 2005 at ¶¶ 5, 8. According to Dow, "it appears" that he contacted Golub in an effort to find someone to write the CCDLA amicus brief and that Golub, in turn, sought an attorney for that purpose. *Id.* at ¶ 7. Dow has a "vague recollection" of discussing, with Golub, Golub's efforts to obtain the assistance of another law firm. *Id.* Dow stated that he does not possess any documents relating to Ross's direct appeal or the CCDLA's or Judge Chatigny's involvement in that appeal. *Id.* at 9.

David Golub confirmed by affidavit that he was involved in coordinating the submission of amicus briefs in Ross's case and had asked then attorney Chatigny to represent the CCDLA as an amicus in that case. *See* Golub Affidavit dated Sept. 23, 2005 at ¶¶ 2–5. Golub recalled that Chatigny had agreed to represent the CCDLA on the amicus application and to research the intended amicus issue, that he provided Chatigny with various materials pertaining to the amicus issue and a draft of the amicus application, and that Chatigny later informed him that he did not believe that the case law supported the argument to be made in the CCDLA brief. They had agreed that Chatigny would do no further work on the matter. *Id.* at ¶¶ 5–7. Additionally, Golub stated that, in July 1992, Chatigny sent him a copy of a brief letter to Ross, which informed Ross that Chatigny was no longer involved in the matter and suggested that Ross contact

Golub for further information. *Id.* at ¶ 9, and exhs. C–E (Chatigny, Ross and Golub letters). In a supplemental affidavit, Golub stated that he did not recall ever discussing Chatigny's involvement with Dow, and does not believe that Dow had any awareness of that involvement. *See* Golub Supplemental Affidavit dated Nov. 23, 2005.

Judge Chatigny's then partner, James Cowdery, submitted an affidavit explaining that he and Chatigny were the only full-time attorneys in the firm of Chatigny & Cowdery in 1992 and that they consulted together on the matter. *See* Cowdery Affidavit dated October 26, 2005 at ¶¶ 3–7. After Golub had asked Chatigny to file the CCDLA brief, Chatigny and Cowdery agreed to seek the court's permission to file the brief, but soon decided that no brief should be filed. *Id.* at ¶¶ 5–7. Because no withdrawal of their firm's appearance was filed, the firm continued to receive service copies of documents in the case. *Id.* at ¶¶ 5, 7. Cowdery also noted that, in May 2005, when the issue of the 1992 amicus application was raised, he, like Judge Chatigny, had no recollection of their firm's brief involvement. *Id.* at ¶¶ 4, 7.[4]

Michael A. Fitzpatrick, a current member of the CCDLA's executive committee and CCDLA president for the one-year term ending in October 2005, advised by affidavit that the CCDLA has no documents in its possession relating to the 1992 amicus application. *See* Fitzpatrick Affidavit dated Nov. 21, 2005 at ¶¶ 3–4, 7–9.

---

4. In supplemental affidavits, Golub and Cowdery stated that they did not know of anyone with personal knowledge of Judge Chatigny's activities relating to the amicus application other than Judge Chatigny, Golub, and Cowdery (aside from other counsel knowing of his representation through the amicus application and the list of counsel to be served with documents in the case). *See* Cowdery Affidavit dated Nov. 15, 2005; Golub Affidavit dated Nov. 23, 2005.

Fitzpatrick himself had represented Ross on direct appeal from November 1992 to approximately October 2004. *Id.* at ¶ 10. Fitzpatrick stated that, until the May 2005 media coverage of Judge Chatigny's prior involvement, he had been unaware that Judge Chatigny had filed the amicus application. *Id.* at ¶¶ 11, 14.

In response to the Committee's request for all relevant documents, Judge Chatigny informed the Committee that he did not possess any relevant files but arranged for Cowdery to obtain the files relating to the CCDLA representation from his former firm's archives. *See* Response to Special Committee's Request for Files, Documents or Tangible Things, dated Sept. 21, 2005. The documents retrieved by Cowdery and produced to the Committee are consistent with Judge Chatigny's account. The bulk of the documents in the firm's files are service copies of documents generated by other parties to the litigation or Golub, or are photocopies of reported decisions. *See* response. Only eighteen pages of handwritten notes, several with as little as 20 to 30 words on them, were identified as containing the writing of either Judge Chatigny (15 pages) or Cowdery (3 pages). *See* Zeldes letter dated October 21, 2005. None of these documents contradicts the judge's assertion that he did no substantial work in the matter.

The Complainant in 05–8519, who represented the State in Ross's direct appeal, had no memory of any involvement by Judge Chatigny. His complaint resulted from his receipt of information (or a rumor) from another employee of the State's Attorney's Office, who, in turn, received it from an employee of the Connecticut Legislature's House Republicans press office, who has not identified his source. Those persons were contacted by the Committee's representative. None had any knowledge of the extent of the work done by the Chatigny firm in Ross's state court appeal.

The Committee has been unable to locate any other person with knowledge of Judge Chatigny's involvement in Ross's appeal or in possession of documents relating to that involvement. Among others, the eleven people who served terms as CCDLA president after Dow's term ended in 1992 have all stated that they have no knowledge or relevant documents.

Finding no reason in the evidence to doubt Judge Chatigny's sworn statement that, during the conduct of the proceedings before him, he had no recollection of the prior involvement, we conclude there was no misconduct and recommend dismissal of this claim.

**B. Whether Judge Chatigny improperly threatened Paulding with disbarment if he did not pursue particular issues.**

The Complaints assert that Judge Chatigny committed misconduct in threatening the disbarment of attorney Paulding.[5] While the judge used strong language, there was no misconduct. Under the proper circumstances, a judge may deliver a warning that threatens a misbehaving attorney with disciplinary action—a contempt citation by the judge or referral to another disciplinary authority—without necessarily interfering with any legitimate

---

**5.** These allegations were raised in conjunction with the allegation that Judge Chatigny interfered with Ross's Sixth Amendment rights. The Committee has treated the threat allegation both as an independent claim and as a supporting argument for the Sixth Amendment claim.

right of the attorney or the attorney's client. *See United States v. Dennis,* 183 F.2d 201, 225 (2d Cir.1950) (L.Hand, J.). The relevant facts are as follows:

As noted earlier, the two federal court actions were filed only a few days before the execution, which was scheduled for January 26, 2005 or within five days thereafter. *See* Complaints at 1. Judge Chatigny held a conference in the habeas action with the parties' attorneys and Paulding on January 24, 2005 for the purpose of determining whether the petitioner was entitled to "next friend" status. A discussion ensued on Ross's competence and volitional capacity. *See* Jan. 24, 2005 Trans. In view of Ross's determination and his instructions to his attorney to waive any further challenge to his execution, the question of his competence to make such waiver was of critical importance.

Judge Chatigny concluded that the question of Ross's competence involved sufficient unresolved issues to warrant granting of next-friend status and a stay of the execution to permit further review. *Id.* at 38, 84–90. Of particular concern to Judge Chatigny was the fact that certain evidence drawing Ross's volitional capacity and competence into question had never been "the subject of an adversarial proceeding" or been "explored factually" in state court or in a prior federal action before a different district judge. *Id.* at 20, 87. On January 25, 2005, the Second Circuit found that the grant of next-friend status was premature. The court instructed that the judge first determine Ross's competence because next-friend status depended on that determination. The Court of Appeals, however, denied the State's motion to vacate the stay of execution. *See Ross ex rel. Smyth v. Lantz,* 396 F.3d 512, 513–15 (2d Cir.2005). The State ap-

pealed the Second Circuit's decision to the Supreme Court.

In the meantime, the § 1983 action was filed on January 25, 2005 by Ross's father, asserting that Ross's execution would violate the father's constitutional rights. *See* Complaint and Amended Complaint in *Ross v. Lantz,* No. 05–cv–130 (D.Conn.) (docket entries 1, 11). The following day, Judge Chatigny held a conference regarding the § 1983 action, during which the State's attorneys stated that they were "at a significant loss to understand" the due process claim asserted in the complaint, Jan. 26, 2005 Trans. at 13–17, and "adamantly disputed" Judge Chatigny's jurisdiction to enter a second stay of execution, *id.* at 20. In response to the State's attorneys' question whether the stay in the § 1983 action would be vacated if the Supreme Court vacated the stay in the habeas action, Judge Chatigny stated that vacatur of the first stay by the Supreme Court would not require vacatur of the second stay as the two stays were based on different premises and protected different rights or interests. *Id.* at 23–25, 27–30. Judge Chatigny stated that the stay in the § 1983 action was intended to protect the father's interests, as opposed to the "next-friend" interest of the petitioner in the habeas action. *Id.* at 24–25, 27–30.

At that point, one of the State's attorneys asked, "In light of Your Honor's ruling today, . . . does Your Honor hold any personally held beliefs or has Your Honor written in any other cases that we just haven't been able to find yet that would cause us to question your partiality with respect to the implementation or execution of a death sentence in any situation?" *Id.* at 25–26. Judge Chatigny responded that he did not have any "moral beliefs or other types of beliefs that would stand in the

way of implementing a death penalty in the circumstances where the law called for it to be done." *Id.* at 26. He then added that he felt "very strongly that[,] as a federal district judge..., [he] had a profound responsibility to look very, very carefully at these issues." *Id.*

On January 27, 2005, the Supreme Court, by a 5-to-4 vote and without explanation of its reasons, vacated the stay of execution in the habeas action. *See Lantz v. Ross*, 543 U.S. 1134, 125 S.Ct. 1117, 160 L.Ed.2d 1091 (2005). Then, on January 28, 2005, the Second Circuit vacated the stay of execution granted in the § 1983 action, based on the plaintiff's failure to establish a likelihood of success on the merits or the existence of sufficiently serious questions on the merits to make them a fair ground for litigation. *See Ross v. Rell*, 398 F.3d 203, 205 (2d Cir.2005). However, the Second Circuit stayed its order to allow the § 1983 plaintiff to seek further review in the Supreme Court. *Id.*

The same day, Judge Chatigny held a conference to discuss new evidence bearing on Ross's competence, which had been received a day earlier in the form of a letter from a prisoner named Lopez. *See* Jan. 27, 2005 Trans. at 4–10 (Judge Chatigny noting receipt of letter from prisoner discussing Ross's state of mind); Jan. 28, 2005 Trans. at 4 *et seq.* The conference began with a discussion of the Lopez letter, which cast doubt on Ross's competence and suggested that Ross may be impaired by death-row syndrome depression. *See* Jan. 28, 2005 Trans. at 4–6.

Judge Chatigny asked Paulding if he believed that he had an obligation to speak with Lopez. *Id.* at 7. Paulding responded that he did not think it was necessary to do so. *Id.* Judge Chatigny then asked if Paulding had provided Dr. Norko, the psy-

chiatrist who had previously found Ross competent, "with Mr. Lopez's letter and asked him if it affects his opinion of the situation." *Id.* Paulding said that he had not, but then appeared to offer to do so: "If you'd like me to try to get ahold of Dr. Norko ...." *Id.* Judge Chatigny answered, "I would." *Id.* Judge Chatigny then gave his view on how Paulding should proceed, making clear that he thought his, Judge Chatigny's, opinion "may be wrong":

> I as the chief judge of the court have to be sure that you are doing everything that one should do ethically in this situation. And I believe that includes—and my opinion may be wrong—but if I were you, before I continued to play this decisive role, I would want to interview Mr. Lopez myself.... I would certainly want to speak to Dr. Norko.

*Id.* at 7. After suggesting various questions that Paulding could present to Dr. Norko, Judge Chatigny stated: "So I put it to you as an officer of the court and as the chief judge of the court, what do you think about that, Mr. Paulding?" *Id.* Paulding said he disagreed.

> I really think that the suggestions you're making are well-founded. I will tell you, I do have somewhat of a difference of opinion, which is not necessarily going to make me not do what you're suggesting, but I do have a difference of opinion on whether or not ... the conditions at Northern and the death row syndrome phenomenon and all those issues, whether those have somehow created in Michael Ross, these feelings of despair.

*Id.* at 8–9. Paulding then explained at length why he believed that Ross was competent. *Id.* at 11–15. In response, the Judge complimented Paulding, and then

attempted to convince Paulding that he might be making an error:

> Mr. Paulding, you impress me as a sincere, kind, compassionate person. And I won't try to be even more descriptive than that. I feel strongly that you're way out on a limb, and I want to be sure that I discharge my responsibilities as the chief judge of the court dealing with you as a officer of this court in making sure that you don't commit a very grave error.

*Id.* at 15. Judge Chatigny's efforts to convince Paulding then became more insistent, and included a number of strongly-worded statements:

> I do not know how anybody in your position could be accepting of this responsibility to proceed in the face of this record to be the proximate cause of this man's death. ... I think you are way out on a limb. And I appeal to you. You need to see what you are doing.

*Id.* at 24–25.

> [Y]ou seem to be saying, He's perfectly rational. All of this is beside the point. I've got total confidence in him, there's no problem. Believe me, we can all be content that we have a perfectly rational man here going to his death with our taxpayers' dollars footing the bill because I'm telling you he's right there. And you don't know what you're talking about. And you're an officer of this court. And I see this happening and I can't live with it myself.... It's wrong. What you're doing is wrong.... What you are doing is terribly, terribly wrong. No matter how well motivated you are, you have a client whose competence is in serious doubt and you don't know what you're talking about.

*Id.* at 28. The judge then continued with the statements characterized by the Committee.

plaints as improper threats against Paulding:

> So I warn you, Mr. Paulding, ... you better be prepared to live with yourself for the rest of your life. And you better be prepared to deal with me if in the wake of this an investigation is conducted and it turns out that what Lopez says and what this former [prison] program director says is true, because I'll have your law license.
>
> \* \* \* \* \* \*
>
> And ... you should go tell Mr. Ross that what we are doing is in his best interest.... Then you better make a clear record of it. You better have a court reporter there taking down the advice you're giving him, because believe me if—you're going to need it. You're going to need it. Because I think now that the can of worms has been opened, it is not going to be closed. This is going to get to be very messy.

*Id.* at 29.

Later on January 28, after the conference, the Supreme Court vacated the Second Circuit's temporary stay in the § 1983 action, again without explanation of its reasoning. *See Rell v. Ross,* 543 U.S. 1134, 125 S.Ct. 1117, 160 L.Ed.2d 1091 (2005).

On January 29, 2005, Paulding changed course and requested a postponement of the execution from the State. In his affidavit submitted to the Committee, Paulding describes his reasons for that request as follows:

> I made this request because of my concern that the Lopez letter was potentially the type of material information I had previously pledged to bring to the attention of the courts. Of equal importance, I also wanted more time to consider the question of whether I might have a con-

flict between my duty to follow my client's directions and my duty to the courts.

Paulding Affidavit dated Oct. 31, 2005 at ¶ 22. On January 31, 2005, Paulding asked the state court to re-open the competency hearing; he later explained:

My decision to file [in state and federal court] the January 31 motions to stay and re-open the competency hearing was based, in part, on Judge Chatigny's statements to me during the January 28 phone conference. But the principal reasons I filed the motions were Dr. Norko's phone call to me on . . . January 29, my meetings with Dr. Norko [and an acquaintance of Ross who had heard Ross make certain statements about his mental state] on January 30, and my strong belief that Dr. Norko's desire to re-assess his earlier opinion was unquestionably material to the State court's prior finding of my client's competence. My decision also was consistent with my previous representations to the courts that I considered myself duty bound to present the courts any material information casting doubt on my client's competence, and to do so quickly enough to ensure that such information could be considered in advance of the scheduled execution.

*Id.* at ¶ 35; *see id.* at ¶¶ 12, 24–25, 29. The Connecticut Supreme Court's later decision upholding the state trial court's new finding that Ross was competent to waive further challenges to his execution indicates that most, if not all, of the new evidence presented to Judge Chatigny in the January 2005 proceedings was considered by the state trial court in making its new competency decision. *See Ross,* 273 Conn. at 696, 873 A.2d at 139 (listing among the witnesses who testified in state

trial court competency hearing the psychiatrist and retired prison official whose evidence was discussed by Judge Chatigny).

Judge Chatigny's written responses to the Complaints discuss the allegations of abusive speech. In his May 4, 2005 memorandum to Chief Judge Walker, Judge Chatigny described the urgency of the situation facing him in the two actions, the novelty of the issues, and his belief that he was correct to insist that the competency issue be further explored. Although objecting that he did not subject Paulding to a "tirade," and that his "speech was not angry, violent, or abusive," he did concede that

some of the things [he] said under the stress of the circumstances . . . were too vehement, in particular, [his] statements to Attorney Paulding that if he facilitated the execution of an incompetent client, [the Judge] would "have his law license," and that he should have a court reporter record his advice to his client because, if the execution went forward, he was "going to need it."

May 4, 2005 Memorandum at 2. While stating that lawyers would have understood his words as cautioning Paulding that Judge Chatigny would discharge his judicial responsibility to report any failure on Paulding's part to meet his professional obligations, Judge Chatigny recognized that his words could be misinterpreted. He added that he regretted both his choice of words and any embarrassment he may have caused to the court system. *Id.* at 3–4.

In Judge Chatigny's July 7, 2005 letter, he added that his statement to Paulding that he would "have [Paulding's] law license" resulted from his belief that the urgent circumstances made a strongly-worded statement "necessary and appro-

priate." July 7, 2005 letter at 1–2. But, as noted above, he characterized the words as "excessive." *Id.* at 2.

Additionally, Judge Chatigny asserted, and Paulding has confirmed, that Judge Chatigny apologized to Paulding on January 31, 2005 (the next business day after the January 28 conference). In his July 7 letter, Judge Chatigny stated that he had apologized because his "warning [to Paulding] concerning the potential consequences of a failure to discharge his ethical responsibility should have been phrased in terms of the obligation [Judge Chatigny] would have [had] to refer him to grievance authorities," rather than the assertion that Judge Chatigny would "have" his license, and because the "words [he] used were excessive" and he "regretted them immediately." July 7, 2005 Letter at 2. In Paulding's affidavit, Paulding states the following about the apology:

> While in the reception area of the judge's chamber, the judge asked to speak with me privately. Judge Chatigny said: "I think I owe you an apology." I interrupted the judge to tell him his apology was unnecessary. I then told him that "what I heard" during the January 28 conference call was someone "who felt strongly about doing what he thought was right."
>
> I have read Judge Chatigny's July 7, 2005 letter to Chief Judge Walker. I do not disagree with his characterization of his comments to me during the January 28 telephone conference, or with his description of his apology to me on January 31.

Paulding Affidavit dated Oct. 31, 2005 at ¶¶ 27–28.

The principal problem with the judge's threat to "have [Paulding's] license" was that it was ambiguous. The remark could have meant that Judge Chatigny was threatening to use his influence to cause the revocation of Paulding's license to practice, or at least to practice in that federal court. Such a threat might well be improper. It could on the other hand have meant no more than a threat to refer Paulding's conduct to disciplinary authorities, who, the judge was convinced, might well revoke Paulding's license if he failed in this matter of ultimate importance to protect his client's interest. Such a threat would have been altogether appropriate. We think there can be little doubt that the threat intended was of the latter sort.

The words cannot be read in isolation. The preceding colloquy clearly shows Judge Chatigny's growing exasperation with the fact that Ross was about to be executed, based on his waiver of legal remedies, in the face of a reasonable possibility that he was not competent to give such a waiver, but his lawyer was refusing to take steps to examine new evidence casting doubt on his client's competence. The judge was clearly concerned that Paulding's reluctance to engage the court in the question of Ross's competence (based on Paulding's sense that he was bound by his client's instructions) might cause an unconstitutional execution. It is clear the judge's concern was to repair what he perceived as a breakdown in the adversarial process, resulting from an attorney's insistence on adhering to his client's expressed desire to waive judicial review and consent to his execution, in spite of indications that the client might be without competence to make such a waiver. The judge's perception of the need for remedial action in his communications with the attorney was reasonable. While his words were strong, when properly understood they were not unreasonable. While we

express no view of the legal correctness of the judge's actions, we find no misconduct.

It is worth emphasizing that in the heat and tension of court proceedings, ambiguities can easily occur. This is especially so in emotionally charged matters such as the administration of the death sentence. Judge Chatigny's words clearly were intended and understood as a forceful effort to make Paulding confront the judge's perception that Paulding's acceptance of his client's instructions, to his client's extreme prejudice, in spite of reasonable objective doubts about the client's competence, would amount to a dereliction of duty, which would be reported by the judge and might result in a revocation of the lawyer's license. It is noteworthy in seeking to interpret these ambiguous remarks that it is not Paulding but his litigation adversaries who argue that the judge improperly threatened Paulding. Paulding observed to the contrary that he had understood Judge Chatigny's remarks as reflecting that Judge Chatigny "felt strongly about what he thought was right," Paulding affidavit dated Oct. 31, 2005 at ¶ 27, and added that he did not disagree with Judge Chatigny's characterization of the comments, *id.*, at ¶ 28. Finally, Judge Chatigny's apology to Paulding and his decision to make public his July 7, 2005 letter, regretting his use of words as excessive and noting his apology, could be considered appropriate corrective action if anything he had done could be said to warrant it.[6] Because we believe corrective action is unnecessary, we simply note that they demonstrate appropriate self-examination

and an awareness of the possibility that his words could be misconstrued.

The Committee finds that there was no misconduct in this episode and recommends that the Judicial Council dismiss the Complaints addressed to this exchange.

## C. Whether Judge Chatigny interfered with Ross's constitutional right to representation by counsel of his choice.

The Complainants charge that Judge Chatigny interfered with Ross's Sixth Amendment right to counsel of his choice by forcing Paulding to pursue the competency and volitional capacity issues against Ross's wishes. *See* Complaints at 5. Judge Chatigny responded that it was appropriate to press Paulding to inquire into Ross's competence before being governed by Ross's instructions. *See* July 7, 2005 Letter at 1–2, 3–5. The facts relating to this claim have already been set forth.

Both the Supreme Court and this Court have repeatedly stated that a district judge is not a moderator, umpire, or passive spectator, but is obligated to intervene whenever necessary to ensure that proceedings over which the judge presides are fairly conducted, even if that intervention conflicts with the intended strategy of one of the parties or attorneys. *See Lakeside v. Oregon,* 435 U.S. 333, 342, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) (holding that trial judge's denial of requested jury instruction did not violate defendant's right to assistance of counsel); *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980) (holding that judge's statements and actions did

---

6. *See, e.g., In re Charges of Judicial Misconduct,* 404 F.3d at 697; Jeffrey N. Barr and Thomas E. Willging, *Decentralized Self–Regulation. Accountability, and Judicial Indepen-* dence Under the Federal Judicial Conduct and Disability Act of 1980, 142 U. Pa. L.Rev. 25, 98 (1993) (discussing typical corrective action after intemperate comments).

not deprive defendants of fair trial and effective assistance of counsel); *see also United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir.2006); *United States v. Filani*, 74 F.3d 378, 385, 386 (2d Cir.1996).

In *Lakeside*, the Supreme Court commented on the relationship between, on one hand, a party's right to counsel and counsel's right to determine strategy, and, on the other hand, the judge's supervisory obligations:

> In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel. But that right has never been understood to confer upon defense counsel the power to veto the wholly permissible actions of the trial judge. It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial. " '[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.' "

*Lakeside*, 435 U.S. at 341–42, 98 S.Ct. 1091 (quoted sources omitted). "Inadequately prepared or overly aggressive advocates may indeed require that the trial court interpose itself more actively and even forcefully in the proceedings to ensure fairness." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 788 (3d Cir.1996). For example, if a lawyer is clearly providing ineffective representation, a judge may attempt to avoid an appealable issue by steering the lawyer back on course.

The Complainants' Sixth Amendment claim is meritless. If Paulding's compliance with Ross's instructions would violate Paulding's ethical obligations, then those instructions must give way and may not be the basis for a Sixth Amendment claim. Under Rule 1.2 of the Connecticut Rules of Professional Conduct,[7] although "[a] lawyer shall abide by a client's decisions concerning the objectives of representation," Rule 1.2(a), the client's authority does not reach beyond "the limits imposed by law and the lawyer's professional obligations," Rule 1.2 Commentary ¶ 1. "When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct." Rule 1.2(e). "[A] lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so." Rule 1.2 Commentary ¶ 1. Under such rules, an attorney may not act as "an unreflecting conduit through which the opinions or desires of a client ... are permitted to flow unchecked" or "silently acquiesce to a client who demands that the attorney pursue measures in the litigation that conflict with applicable ethics provisions." *See Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1327 (11th Cir.2002) (discussing obligations under Georgia ethics rules).

A defendant facing execution may waive challenges to that execution, but only if he is competent to do so. *See Rees v. Peyton*, 384 U.S. 312, 313–14, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966); *Mata v. Johnson*, 210 F.3d 324, 327–30 (5th Cir.2000) (stating that a "habeas court must conduct an inquiry into the defendant's mental capacity, either sua sponte or in response to a mo-

---

**7.** The Connecticut Rules of Professional Conduct are applicable, with exceptions that are not relevant to the present proceeding, to Connecticut lawyers practicing in the federal district court located in that state. *See* U.S. Dist. Ct. for the Dist. of Conn., Local Rule of Civil Procedure 83.2(a).

tion, ... if the evidence raises a bona fide doubt as to his competency"); *see also State v. Ross*, 273 Conn. 684, 703–13, 873 A.2d 131, 143–49 (2005) (reviewing finding that Ross was competent to waive further challenges to his death sentence). It is undisputed that new evidence bearing on Ross's competence had come to light and had not yet been ruled on by any court. If that new evidence supported the conclusion that Ross was not competent to waive his legal rights, Ross would have had no right to compel his attorney to follow his instructions.[8]

Under these circumstances, it is clear that Judge Chatigny committed no misconduct in pressing Paulding to investigate the question of Ross's competence rather than simply following Ross's instructions.

The Committee recommends that the Judicial Council find that Judge Chatigny did not interfere with Ross's right to counsel of his choice and dismiss the claim.

### D. Whether, during the proceedings, Judge Chatigny "abandoned the role of neutral and detached magistrate and instead became an advocate for the position held by the parties who were seeking to stop the execution."

The complaints assert that Judge Chatigny "abandoned the role of neutral and detached magistrate and instead became an advocate" to stop the execution. This allegation refers to the conduct previously discussed in which the judge prevailed on Paulding to explore the Lopez evidence questioning Ross's competence, and to the following additional facts.

During the January 28, 2005 conference, the Judge made the following statements:

Let's look at Michael Ross in the best possible light. I am about to draw a picture of him based on the record I've seen.

I didn't follow the criminal case as it went on all those years. I've only just gotten to know about these matters. So I bring a fresh eye to it.

But looking at the record in a light most favorable to Mr. Ross, he never should have been convicted. Or if convicted, he never should have been sentenced to death because his sexual sad-

---

8. Although the Complaints refer to Ross as "obviously competent," *see* complaints at 5 (second full paragraph), we see no basis for that assertion. Ross's competence or sanity had been a recurring concern throughout the state court proceedings, *see, e.g., State v. Ross*, 269 Conn. 213, 267–75, 292–95, 849 A.2d 648, 689–93, 703–05 (2004) (discussing competency and insanity defense issues); *State v. Ross*, 230 Conn. 183, 192, 221–23, 646 A.2d 1318, 1330, 1343–44 (1994) (discussing issues relating to insanity defense), and every attorney representing him has had to determine how to handle the "conflict" between the obligation to obey Ross's instructions and the

obligation to determine if those instructions would require the attorney to violate an ethical obligation triggered by the possibility that Ross was incompetent. Furthermore it is beyond dispute that the questions raised by the Lopez letter had never been examined by any court. Also, as the Complainants were aware, the psychiatrist who had earlier confirmed Ross's competence had informed Paulding that the new evidence had the potential to alter his conclusion. *See* Paulding Affidavit dated October 31, 2005 at ¶¶ 10–11, 13, 23, 26, 31, 35; *Ross*, 273 Conn. at 694 n. 8, 873 A.2d at 138 n. 8 (describing psychiatrist's affidavit).

ism, which was found by every single person who looked at him, is clearly a mitigating factor. Again we're looking at a record in a light most favorable to him.

Jan. 28, 2005 Trans. at 22. The Judge then discussed Ross's first murder, his alleged mental illness, his failed suicide attempt after the first murder, and how Paulding might change Ross's mind (presumably about cooperating with a new competency determination), followed by the statement, "I suggest to you that Michael Ross may be the least culpable, the least, of the people on death row." *Id.* at 22–231.

Furthermore, the Complainants state, and Judge Chatigny does not dispute, that, after the Supreme Court vacated the second stay, Judge Chatigny had the district court clerk call both the Chief State's Attorney's Office and the Connecticut Supreme Court in an attempt to find a means of contacting the state judge who had signed Ross's death warrant. *See* Complaints at 5. In the amendments to the complaint filed under 05–8519, that Complainant also notes that, after Ross dropped his objections to further exploration of the competency and volitional capacity issues and a new hearing was held in state court, Judge Chatigny's law clerk attended three days of that hearing, during business hours and about an hour's distance, by car, from Judge Chatigny's chambers. *See* June 9, 2005 Amendment in 05–8519 at 2–3; June 27, 2005 Amendment in 05–8519 at 1–2.

In response, Judge Chatigny has informed the Committee, under oath, that his comments concerning Ross's conviction, sentence, and culpability have been misconstrued as expressing a belief that Ross should not have been convicted or sentenced to death. Judge Chatigny stated that he has no such belief, and that he thought that he had made clear that those comments described only "the record in a light most favorable to Mr. Ross." May 4, 2005 Memorandum at 4. According to Judge Chatigny, he

> tried to avoid giving others the wrong impression that [he] believed Ross to be legally innocent, undeserving of the death penalty, or less culpable than others on death row, by emphasizing repeatedly that [his] comments were based on viewing the evidence in a light most favorable to Ross.

*Id.* at 5. He also stated that he made those comments in the hope that they "would encourage Ross to agree to postpone the execution by making clear to him that if he did so he would be treated fairly." *Id.* at 4. In his July 7, 2005 letter, Judge Chatigny stated that he regretted making those comments. *See* July 7, 2005 Letter at 2.

Judge Chatigny also made clear that all of the challenged statements were intended to convince Paulding, and Ross, that the competency and volitional capacity issues needed to be addressed in an adversarial setting, and were not intended as a declaration of his belief as to what the determination in that adversarial setting should be. *See* May 4, 2005 Memorandum at 1–4; July 7, 2005 Letter at 1–5. Finally, Judge Chatigny states that he had attempted to contact the state court judge in order to inform him of the new evidence that had been brought to light and to let him know that Judge Chatigny was available if the state court judge wished to speak with him, and that his law clerk had attended the state court hearing due to the possibility that the issue being decided might return to Judge Chatigny. *See* July 7, 2005 Letter at 6.

The Committee recommends that the Judicial Council dismiss the claim. There is no reasonable indication that Judge Chatigny acted out of bias or partiality.

The Complainants' bias claim is primarily based on: (a) Judge Chatigny's vehemence regarding the need to air the issues of Ross's competence; (b) his marshaling of the facts supporting the petitioner's and plaintiff's claims; (c) his revisiting of the justification for the underlying conviction and death sentence; (d) his strong language to Paulding; and (e) his perhaps overly generous finding that the § 1983 complaint stated a valid due process claim. None of these allegations support a claim of bias or of misconduct.

First, to the extent that these acts were part of Judge Chatigny's legal analysis of the issues before him or his decisions as to how the case would proceed, a finding of partiality is inappropriate. The Supreme Court has stated the following about such allegations:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment

impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (citation omitted). "Strongly stated judicial views rooted in the record, a stern and short-tempered judge's efforts at courtroom administration, expressions of impatience, dissatisfaction, annoyance and even anger directed to an attorney or a party should not be confused with judicial bias." Judicial Conference of the United States, Committee on Codes of Conduct, Advisory Opinion 93, *Disqualification Following Complaint Against Attorney,* ¶ 4 (1980, revised July 1998, modified Dec. 2002).

In a recent decision rejecting a claim that a district judge had repeatedly acted, and ruled, in a manner that suggested she was an advocate for, and had prejudged issues in favor of, the opposing party, the Second Circuit noted the following:

> a district judge is not a spectator. We can readily envision occasions when active involvement by a trial judge is required to ensure that problematic issues are raised and examined. When a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire. While impartiality is required, the distance between disengagement and officiousness leaves district judges

considerable leeway to satisfy themselves that justice has been served. *United States v. Awadallah,* 436 F.3d 125, 136 (2d Cir.2006).

Maintaining both the appearance and fact of impartiality when dealing with such an emotionally charged case involving a long-delayed execution scheduled to occur within days is a difficult and thankless task. Here, notwithstanding instances where Judge Chatigny used strong language and made questionable comments, there is no basis for a charge of bias. *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

As in *Awadallah,* problematic issues had been raised and required examination; although reasonable persons might disagree as to Judge Chatigny's approach and analysis, the transcripts reflect that he "observe[d] occurrences that potentially call[ed] into question the fairness of the proceedings or the thoroughness of a defense," thus making it "incumbent on [him] to inquire" and entitling him to "considerable leeway to satisfy [himself] that justice has been served." *Awadallah,* 436 F.3d at 136.

There is no indication that Judge Chatigny sought to nullify Ross's death sentence; rather, the transcript clearly reflects his focus on ensuring that a proper competency determination be made before crediting Ross's instructions to his attorney to waive legal remedies.

Regarding the most controversial statements made by Judge Chatigny—those concerning Ross's culpability and the validity of his conviction and sentence—these remarks are mischaracterized. They did not purport to express Judge Chatigny's view of the facts. They characterized the evidence when seen in the light most favorable to Ross.

None of the examples of Judge Chatigny's behavior cited in support of this bias claim, whether considered alone or in the aggregate, support the claim that the judge was biased or disposed to thwart the execution of the death penalty. Thus, the Committee recommends that the Judicial Council dismiss these charges.

**E. Whether, after Judge Chatigny's stay orders had been vacated, Judge Chatigny lacked authority to proceed on January 28, 2005, "in the absence of any motion by a party or an Article III case or controversy."**

The Complaints allege that Judge Chatigny committed misconduct in entertaining further proceedings on January 28, 2005, after his stay orders had been vacated and there was no motion by any party before the court. The Committee considers this claim frivolous.

Notwithstanding the fact that the stay orders had been vacated, the actions remained before Judge Chatigny; they had not been dismissed. In fact, the Second Circuit's vacatur of the stay in the § 1983 action was itself stayed by the Second Circuit, in order to preserve the status quo pending review by the Supreme Court. Moreover, while the Second Circuit had cast doubt on the merits of the § 1983 action, the Supreme Court in vacating the stay of the habeas corpus action made no comment of any kind on the merits of the action, or even on the reasons for the vacating of the stay. No doubt, the habeas action would have been moot if, after the vacatur of the stay of execution, Ross had been executed. But that had not happened. It is a daily occurrence, and altogether proper, for judges to hold conferences to discuss the issues that will arise in cases before them, regardless of wheth-

er any motion is pending. *See* Fed. R.Civ.P. 16(a) ("In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference or conferences before trial for such purposes as (1) expediting the disposition of the action; (2) establishing early and continuing control so that the case will not be protracted because of lack of management; (3) discouraging wasteful pretrial activities; (4) improving the quality of the trial through more thorough preparation, and; (5) facilitating the settlement of the case.").

This claim is entirely without merit. The Committee recommends dismissal.

**F.  Whether Judge Chatigny defied, and effectively overturned, the appellate court rulings vacating his stays of execution through the use of threats and intimidation.**

The Complaints assert that Judge Chatigny committed sanctionable misconduct by using threats and intimidation to defy and effectively overturn the rulings of higher courts, which had vacated the stays he had entered. This claim, like the last discussed, is frivolous. As noted above, the ruling of the Supreme Court vacating the temporary stay entered in the habeas corpus action made no comment on the validity of the claims asserted. The vacation of the stay gave no reason to believe that a finding of Ross's incompetency might not change completely the posture of the pending death sentence. What the Complaints describe as "threats and intimidation" was in fact Judge Chatigny's intense effort to make Paulding confront what the judge reasonably perceived as Paulding's ethical obligation to investigate any indication that Ross might have been incompetent in waiving his legal remedies.

There is no justification for the assertion that Judge Chatigny sought to defy or effectively overturn the rulings of the higher courts.

The Committee recommends that this claim be dismissed.

**IV.  *Release of Judicial Council Decision to Public***

Finally, the Committee recommends that the Judicial Council's decision on the present complaints be released to the public and published—both for precedential purposes and to ensure that an accurate statement of the Judicial Council's reasons is available to the public. We see little reason to hold the Council's action in confidence. The underlying events and the allegations in the present Complaints have already received widespread media coverage. Judge Chatigny requested that Chief Judge Walker release publicly the judge's letter responding to the charges.

Chief Judge Walker has issued an order, which provides for the disclosure of the identities of the Complainants, to the extent required by either the Special Committee, as set forth in this Report, or the Judicial Council. *See* Local Rule 17(a)(5). In the same order, Chief Judge Walker also has provided for the disclosure of Judge Chatigny's name and identity, as authorized in writing by Judge Chatigny and approved by Chief Judge Walker, in the event that the Judicial Council determines that the charges of misconduct should be dismissed for reasons other than mootness. *See* 28 U.S.C. § 360(a)(3); Local Rule 17(a)(1). In the event that the Council elects not to dismiss any one count in the Complaints, section 360(b) provides that the Council shall make available to the public its order and, unless contrary to

the interests of justice, the written reasons therefor. *See* 28 U.S.C. § 360(b).

Regardless of the Council's ultimate determination, the Committee recommends disclosure of the Committee's Report and the Judicial Council's order, along with the reasons therefor (whether embodied in this Report or drafted separately by the Council). Few, if any, of the media reports of which the Committee is aware presented all the relevant facts. Release of the Judicial Council's decision would help avoid misperceptions about these proceedings, and would make clear the Judicial Council's reasons for its conclusions. *See generally* 28 U.S.C. § 360(b).

## V. *Conclusion*

The Committee, by unanimous vote, recommends that the Complaints be dismissed and that the attached order be adopted.

The Special Committee:

Chief Judge JOHN W. WALKER, Jr.

Judge PIERRE N. LEVAL.

Chief Judge MICHAEL B. MUKASEY.